Groesbeck, C. J.,
{after stating' the facts as above.) The questions involved in this proceeding were directly passed upon by the supreme court of the late territory of Wyoming when the said Shoshone Indian reservation was a part of Sweetwater county, and before the formation of the county of Fremont from a part of its territory, in the case of Moore v. Board, etc., 2 Wyo‘ 8, and tliebroad statement was then judicially announced that the territory of Wyoming was wholly excluded from the exercise of political power over this reservation, either to regulate the intercourse of its subjects with it, or to extend its municipal authority over it. Therighttotax any property within the reservation was by this decision emphatically denied. We should be loth, at this late day, to re-exam-inethis question, were it not that since the said decision was made there have been a number of decisions of the federal supreme court passing upon the ques tions involved, either absolutely or incidentally, which are in direct conflict with the views of the learned judge who delivered the opinion of the supreme court of the territory in the case first cited. Notwithstanding this decision and the later one of Fremont Co. v. Moore, (Wyo.) 19 Pac. Bep. 438,[1] one of the members of that court, while sitting as a district court for Albany county, upon a cause heal'd and determined by him upon a change of venue from Fremont county, has since held that the county of Fremont, in its corporate capacity, had the right to tax personal property of the plaintiff in this case, the same being live-stockranging on the Shoshone Indian reservation in Fremont county; and the fact that this matter has been sent to us for decision by another district court shows that these decisions of the territorial supreme court have been boldly challenged by bench, bar, and the public. We should not lightly upset these decisions, however erroneous they may appear to us, unless it satisfactorily appears to our minds that they have not been acquiesced in and considered the settled law of this jurisdiction, so that the doctrine of stare decisis would apply, or because it is impossible to follow them with safety, in the light of a more elaborate discussion of the principles involved, and because they are clearly against the weight of authority and the law governing the case. The treaty with the eastern band of the Shoshones and the Bannack tribe of Indians was made and concluded at Ft. Bridger, Utah, July 3,1868, and was after-wards ratified by the president and the *433 senate of the United States. 15 U. S. St. 673. There is neither reservation nor exception in this treaty, as was the casein the treaty with the Shawnees and other tribes, whereby the territory embraced within the exterior lines of the reservation should be excluded and excepted out of the state or territory within which the reservation was geographically situated. It was so expressly decided in the case of Langford v. Mon-teith, 102 Cl. S. 145, where the error made in the case of Harkness v. Hyde, 98 U. S. 476, was corrected. We quote from the opinionin the former case; “ This court, in Harkness v. Hyde, supra, relying upon an imperfect extract found in the brief of •counsel, inadvertently inferred that the treaty with the Shoshones, like that with the Shawnees, contains a clause excluding the lands of the tribe from territorial •or state jurisdiction. In this it seems we are laboring under a mistake. Where no such clause or language equivalent to it is found in a treaty with the Indians within the exterior limits of Idaho,the lands held by them are a part of the territory, and subject to its jurisdiction, so that process may run there, however the Indians themselves may be exempt from that jurisdiction. As there is no such treaty with the Nez Perces tribe, on whose reservation the premises in dispute are situated, and as this is a suit between white men, citizens of the United States, the justice of the peace had jurisdiction of the parties, if the subject-matter was one of which he could take cognizance.” The court further decided that the reservation which was provided for in the Shoshone treaty was not excepted out of the territory of Idaho. The organic act of the territory of Wyoming, approved July 25, 1868, contains the following exception and reservation relating to the rights of Indians, and no other, viz.: “Provided, that nothing in this act shall be construed to impair the rights of person or property now pertaining to Indians in said territory, so long as such riglitsshall remain nnextinguisbed by treaty between the United States and such Indians.” The proviso afterwards inserted in the Revised Statutes of the United States, (section 1839,) is nearly the same as that contained in the organic acts of the territories of *Idaho, Dakota, and probably of other territories, organized prior tothecreation of the territory of Wyoming, thus plainly indicating that the remainder of the proviso which appears in the organic act of these older territories was studiously and for a purpose omitted in the organic act of Wyoming. Section 1839 of the Revised Statutes of the United States reads as follows: “Nothing in this title shall be construed to impair the righ ts of persons or property pertaining to the Indians in any territory so long as such rights remain unextinguished by treaty between the United States and such Indians, or to include any territory which by treaty with any Indian tribe is not, without the consent of such tribe,, embraced within the territorial limits or jurisdiction of any state or territory; but all such territory-shall be excepted out of the boundaries and constitute no part of any territory now or hereafter organized, until such tribe signifies its assent to the president to be embraced within a particular territory. ” The only substantial differences in the phraseology between the organic acts of the territories other than Wyoming and this section just quoted are that the words “to be included” are stricken out of the organic acts, and the word “embraced ” inserted in lieu thereof in the.section; and the clause: “Or to affect the authority of the government of the United States to make any regulations respecting such Indians, their lands, property, or other rights, by treaty, law, or otherwise, which it would have been competent for the government to make if this act had never been passed,” — is also stricken out, but is substantially re-enacted in section L84o, Rev. St. U. S. It will be noticed, although it is contended that the organic acts of the territories existing prior to the revision of the federal statutes of 1874 and 1878 were repealed by the revision, the supreme court of United States, long after the adoption of the revision, refers almost entirely to the organic acts themselves in construing these provisions relating to Indians, as if they were unmodified and unrepealed. We think that the error in the case of Harkness v. Hyde, supra, arose rather from a false construction of the proviso relating to Indian rights in the organic act of Idaho than “from an imperfect extract found in the brief of counsel,” and it appears that the same error runs through the language employed by Mr. Justice Matthews in the case of Ex parte Crow Dog, 109 U. S. 556, 3 Sup. Ct. Rep. 396. He says: “ The district courts of the territory of Dakota are invested with the same jurisdiction in all cases arising under the laws of the United States as is vested in *435 the circuit and district courts oí the . United States. Rev. St. §§ 1907-1910. The reservation of the Sioux Indians lying within the exterior boundaries of the territory of Dakota was defined by article 2 of the treaty concluded April 29, 1863, (15 St. 635;) and by section 1839 of the Revised Statutes it is excepted out of and constitutes no part of that territory. The object of this exception is stated to be to exclude the jurisdiction of any state or territorial government over Indians within its exterior lines, without their consent, where their rights have been reserved, and not extinguished by treaty.” If the Sioux reservation was excepted out of and constituted no part of the territory of Dakota, why was that jurisdiction over Indians alone excluded? Why was it not excluded as to white people? We do not see any such exceptionin the Sioux treaty, which is almost like that of the Shoshone treaty on this point. This ease was, however, decided upon another and a controlling point, — that section 3146, Rev. St. U. S., excepting offenses committed by one Indian against the person and property of another Indian in the Indian country from the operation of the local law, was not repealed.
We are content with the views expressed by the court in the case of Langford v. Monteith, decided earlier, and the cases of Railway Co. v. Fisher, 116 U. S. 28, 6 Sup. Ct. Rep. 246, and U. S. v. Kagama, 118 U. S. 375, 6 Sup. Ct. Rep. 1109, decided later, which are harmonious with the case of Langford v. Monteith. Although it was decided that the exclusive authority and jurisdiction of the United States over Indians in the Indian country was not lost in the Crow Dog Case, this objection was removed by the statute of March 3, 1885, which provided that Indians should be tried for many offenses arising under the territorial laws by the territorial courts in which the reservations were situate, and this act was declared valid in the case of U. S. v. Kagama, supra. In re Gon-shay-ee, 130 U. S. 343, 9 Sup. Ct. Rep. 542. However, admitting that the disputed portion of section 1839, Rev. St. U. S., superseded and repealed the organic act of Wyoming, yet we cannot see that it has any such meaning as is sometimes attributed to it. It certainly is not free from ambiguity, but, reduced to simple language, in an intelligible form, it would read thus: “Nothing in this title [“Territories.” tit. 231 shall be construed to include any territory which by treaty with any Indian tribe is excluded from the territorial limits of any state or territory; but all such territory shall be excepted out of the boundaries and constitute no part of any territory now or hereafter organized. ” The clause “ all such territory ” must mean the territory which, by treaty with the Indians, is excluded from the territorial limits or jurisdiction of any state or territory. .There is no such reservation or exception in the Shoshone treaty, and this was directly and of necessity decided in the cases of Langford v. Monteith and Railway Co. v. Fisher, supra. If we adopt the construction of the federal supreme court in these cases, (and we are bound to do so,) that the Ft. Hill (Hall) reservation was a part of the territory of Idaho, notwithstanding the greater restriction imposed by its organic act, we must hold that the Shoshone reservation in Wyoming, which was provided for and designated in the same treaty, was a part of the territory of Wyoming, and consequently a portion of the county of Fremont, wherein itlies. Our attention has been called tosection 663 of the Revised Statutes of Wyoming, defining the boundaries of Fremont county, wherein it is “provided that if, by reason of any treaty with the Shoshone or Arapahoe tribe of Indians, the IndiaD or government title to any lands or reservation within the limits of the county shall be extinguished, the same shall form and constitute a part of the aforesaid county. ” We think that this .proviso was inserted through an excess of caution, and in view of the decisions of the territorial courts. No territory was excluded from the county, by the act organizing it; and, if the Shoshone reservation is a part of Wyoming, it certainly must be a part of Fremont county, within the exterior boundaries of which it lies. At the time, then, of levying the taxes upon the property of plaintiff in 1889, the territorial courts, as such, had both civil and criminal jurisdiction over the Shoshone Indian reservation in Fremont county, so that process could run there, and, of necessity, so that process could be enforced there.
The question is, was there any further jurisdiction of the territory, such as the taxing power cfver this reser vation? It is undoubtedly true that when a given area is within the defined limits of a municipality it would be presumed to be within the jurisdiction of the same for all purposes, including taxation. If it be excluded or *437 exempt ior any purpose, the exemption should clearly appear. The realty cannot be taxed ; the soil belongs to the government, of which the Indians have the usu-fruct. The property of thelndianscannot be taxed. It is true, as stated in the case of Eremont Co. v. Moore, supra, that “ the jurisdiction to tax and the jurisdiction of the courts are not necessarily co-extensive. ” But, the general jurisdiction being conceded, we do not see, on principle, why the taxing power may not exist over the person and property of any person not an Indian, so long as the rights of the government or of the Indians are not impaired. We do not agree to the proposition that property on the reservation could not be distrained if it could lawfully be taxed there. There is no pretense that the plaintiff, Torrey,is a post trader, oran officer or agent of the government. It is folly to say that a tax collector could not enforce his warrant for the collection of taxes on the reservation with as much propriety as a sheriff could serve a civil writ or' a criminal warrant there. The reservation does not belong to the Indians, as the title to the soil is in the government, and the Indians have but the usufruct to theland, unless they choose to select and cultivate the land in severalty; and even when this is done, on the aban-donmentof such a purpose the land reverts to the government. It was not the purpose of congress to create an imperium in imperio within our limits, nor to make a foreign country of an Indian reservation. The doctrine that thelndians areseparate nations, or even “dependent sovereign-ties, ” as they are named in the first Moore Case quoted above, has long ago been exploded. They are considered the wards of the government, as in a condition of pupil-age, and as “dependentpoliticalcommunities.” They are kept on reservations to restrain their natural propensities to roam over a large scope of country; to keep them from contact with the meaner whites, from whom they have absorbed the vices, without the virtues, of civilization; to secure the settlers in the vicinity of the reservations, who have planted with so much care their homes in a frontier country, the peaceable occupation of their lands, improvements, and property; and to give to the Indians a “local habitation and a name,’’and thus to gradually overcome their hereditary lawlessness and their indisposition to labor. They are dependent upon the government for food, clothing, and shelter, for their protection from the rapacity of the stronger race, from their internal quarrels, with the encouragement to improve their condition by every incentive that can be afforded to such a people. The law on the subject of the treatment of thelndians is a curious and an interesting study. After a cen tury of dealings with them, a new and a m ore sensible policy found legislative utterance, forced by the imperative logic of events,in the statute of March 3,1871, (section 2079,Rev.St. TJ. S.,) which provides that no Indian tribe or nation within the territory of the United States shall be ackn o wledged or recognized as an independent nation, tribe, or power, with whom the government may contract by treaty, saving all existing rights growing out of treaties then in existence. Since the enactment of this law, agreements with the Indians are no longer held as “treaties” requiring the assent of the president and the senate, but these contracts must be ratified by a solemn act of congress, in which the concurrence of the lower branch of congress, which carries the purse, must be obtained, as well as that of the upper branch, which bears the sword. The statute of March 3, 1885, as was well said by Mr. Justice Miller, in the Kagama Case, quoted above, “does not interfere with the operation of state laws upon white people found there,” (on an Indian reservation.) We consider the case of Railway Co. v. Fisher, 116 U. S. 28, 6 Sup. Ct. Rep. 246, much stronger. The railroad company obtained a cession of its right of way through the Ft. Hill (Hall) reservation, and claimed exemption from local taxation, because the reservation was excepted out of and formed no part of the territory of Idaho, and because the taxing power did not extend over the reservation. But the court held that the road and property of the company thereupon was subject to taxation for territorial and county purposes, and was only “withdrawn so far as necessary for the construction and working ofthe road and the use of buildings connected therewith” from the reservation, and that the reservation was not excluded from the territorial limits of Idaho. It was further said in the opinion that, if the railroad company constructed and operated a railroad through this reservation, it could not be perceived that any just rights of the Indians were impaired by taxing the road and the property used in operating it. It seems, therefore, that the only j urisdiction *439 of the territory that was excluded from this reservation was such only as might impair the rights of the Indians. Hence, with the supreme court .of the United States, we do not see that any just rights of the Indians could be impaired by taxing the property of the plaintiff. If the plaintiff ranged his cattle and other livestock on the reservation, without the consent of the Indians, he is in the attitude of a trespasser or wrong-doer justifying his immunity from taxation by his own wrongful and unlawful act. If his livestock were ranging there with the consent of the Indians, he would come within the rule laid down in "the case of Railway Co. v. Fisher. Even under a contract with the Indians, he might be compelled to remove his property from the reservation, as were those who leased lands from the Cherokees, and who were expelled by the proclamation of the president of July 23, 1885. 24 U. S. St. at Large, 1. If his live-stock, which appear to have been de-pasturing on the reservation solely for his pecuniary benefit and gain, are exempt from taxation while there, there is nothing in the way to prevent others subject to taxation, whose property has its situs in Fremont county, from moving their personal effects and chattels across the line into the reservation during the assessment period, and, when that time has expired, returning with it. In such a ease the reservation becomes a rendezvous for those who seek to escape taxation, — an asylum for those who would evade the just burdens of government. Taxation is an incident of civilization, and he who would avoid it must expatriate himself, and transfer his property where government is unknown. Much stress is laid upon the clause of the Shoshone treaty which provides that “the United States now solemnly agrees that no persons except those herein designated and authorized so to do, and except such officers, agents, and employes of the government as may be authorized to enter upon Indian reservations in discharge of duties enjoined by law, shall be permitted to pass over, settle upon, or reside in the territory described in this article for the use of said Indians, ” etc. This clause was discussed and construed in the case last mentioned, (Railway Co. v. Fisher,) and the conclusion reached was “that the authority of the territory may rightfully extend to all matters not interfering” with the protection of the Indians. It is strange that the plaintiff sets up his own wrong in this matter — his own trespass, his own unlawful presence on the reservation — as a reason why others should not go there to interfere with him. It is contended that the-plaintiff can receive no direct benefits from the taxation of his property on the reservation, because schools cannot be maintained there, nor roads laid out, nor bridges built at the expense of the county, and for the reason that the taxes collected there cannot be there distributed and expended in common to and with other portions of the county. This is too narrow a view to take of taxation. “Thestatelevies taxes for the support of its go vern ment and for all public needs, that it may be able to carry into effect its mandates, and to perform its manifold functions; and the citizen pays from his property his portion, that he may secure thereby the enjoyment of the benefits flowing to him and his neighbors from organized society. No government can be so administered, even by the most conscientious rulers, that there may not be apparently unjust and inequitable consequences in particular cases. ” Cooley, Xax’n, pp. 1-3. There are many instances of this arising from the operation of our revenue laws. The childless man must pay for the education of the children of others, the thrifty citizen must contribute to the support of those who have become indigent through their unthrift, the upright must be taxed for the support of the vicious criminal, the sane must care for the insane. The general school tax in each county in Wyoming is collected from the taxable property of the whole county, whether settled or unsettled, but it can only be expended in the settled portions thereof, which are divided into school-districts, and one may be compelled to pay for the expense of building a bridge or of maintaining a public highway where he may never travel the one or cross the other. Yet the plaintiff may sue and be sued in the local courts; and he now seeks their aid to secure him exemption from taxation when he is not willing to contribute for their support, although his liability for costs is but a small fraction of the salaries of officials, and the eosts-of maintaining the courts. He could have even an Indian punished for the larceny of his stock, in the local courts, and he could recover in the same tribunals property wrongfully detained from him by another on the reservation. His position is no worse, but the same, *441 as the Utah & Northern Railway Company in the case last quoted, where the corporation could not expect to receive all the benefits, in common with others, of the moneys received and derived from territorial and county taxes, as no roads could possibly be laid out or maintained, nor bridges built, nor schools established on its right of way, yet it was held that the company was liable to be taxed. The case of Bridge Co. v. City of Louisville, 81 Ky. 189, depends upon a different principle, as there the power of the state to tax the bridge was upheld, while the right of the city to tax was denied, as, although the bridge was within the corporate limits, yet it was withoutthetaxablelimit. This principle, in the case of the extension of the limits of a municipal corporation over suburban and farming property, not laid off into lots, has been frequently announced by the courts of Michigan and other states. In this connection we think the decisions in Wisconsin collected in the case of Lumber Co. v. Brown, 73 Wis. 294, 40 N. W. Rep. 482, are more in point. In re Phœnix, etc., R. Co., (Ariz.) 26 Pac. Rep. 310.
We answer the questions reserved and sent to us as follows: The county of Fremont had in the year 1889 full right, power, and authority to assess for taxation and levy a tax upon the cattle and horses of the plaintiff which were during all that year kept and located upon the Shoshone Indian reservation, which lies within the geographical limits of said county, and the cattle and horses of the said plaintiff as kept and located upon said reservation during said year were subject to taxation in said county for said year, and the said taxes so levied and assessed upon said property were not void, wrongful, or illegal for the want of jurisdiction to tax the same. The district court of judicial district No. 3, sitting for the county of Fremont, is directed to sustain the demurrer of the defendant to the petition of plaintiff, and to proceed with the cause, and to make such disposition thereof as shall be consistent with this opinion.
Conaway and MerRell, JJ., concur.

 Ante, 200.