## MOORE v. BEASON, COUNTY TREASURER.

TAXATION — PROPERTY OF AN INDIAN TRADER AND POST TRADER UPON AN INDIAN RESERVATION SUBJECT TO.

1. A State tax upon the property of an agent of the general government is not prohibited, merely because it is the property of such an agent. To prevent such a tax its effect must be to deprive the agent of the power to serve the government as he was intended to serve it, and it must in fact hinder and delay the efficient exercise of the agent's powers. A tax upon the agent's property has no such necessary effect.

2. A licensed Indian trader is not to be regarded as an agent of the government, but as one who is engaged in commerce with an Indian tribe, in the Indian country, by the permission, and under the regulations of the national government affecting such commerce.

3. Cattle and horses owned by a licensed Indian trader, and kept and grazed upon the Indian reservation with the consent of the Indians who are paid for the privilege, are subject to State taxation.

4. A post trader is neither an officer nor an agent of the United States.

5. Property otherwise taxable, is not exempt from State taxation because the owner is a post trader, and the property is located upon an Indian reservation.

6. In case of the non-payment of taxes lawfully levied under State laws upon property located upon an Indian reservation, owned by one who is both an Indian trader and a post trader, the property can be distrained in the same manner, and to the same extent as other like property may be distrained under existing laws for like taxes.

[Decided January 26, 1898.]

RESERVED questions from the District Court for Fremont County, HON. JESSE KNIGHT, Judge.

James K. Moore brought this suit to enjoin the collection of taxes levied upon cattle and horses kept and grazed upon the Shoshone Indian reservation. The petition was demurred to, and upon submission of the demurrer certain questions were reserved for the decision of the supreme court.

*D. A. Preston* and *Van Orsdel & Burdick*, for plaintiff.

A post trader is not liable to State taxation. He is an agent of the government. (U. S. Rev. Stat., Secs. 2133, 2128 ; 7 Minn., 140.) Plaintiff being an Indian trader is lawfully upon the reservation, and it is by reason of such facts exempt from State taxation. He is an agent of the government. (U. S. v. Kagama, 118 U. S., 375 ; Mc Cullough v. Maryland, 4 Wheat, 314 ; Ft. Leavenworth R. R. Co. v. Lowe ; Com. v. Clary, 8 Mass., 72.) The agency of an Indian trader is one of the instrumentalities by which the government handles the Indians over whom it has exclusive control. The cases of Torrey v. Baldwin, decided in this court, involved property on the reservation without authority.

*J. S. Vidal*, and *Clark & Breckons*, for defendant.

That property located upon the Shoshone Indian reservation is taxable, was decided in Torrey v. Baldwin,

3 Wyo., 430. The fact that the plaintiff, the owner of the property, is an Indian trader, and that as such he was an agent of the government, can not operate to exempt his property from taxation. (25 Ency. L., 159 ; U. P. Ry. Co. v. Penniston, 18 Wall, 5 ; Thompson v. R. R. Co., 9 id., 579 ; Bank v. Ky., 9 id., 353 ; Tel. Co. v. Atty. Gen'l., 135 U. S., 530 ; Co. of Santa Clara v. R. R. Co., 18 Fed., 386 ; Ragan v. Trust Co., 154 U. S., 418 ; Ry. Co. v. Cal., 162 id.) The consent of the Indians does not render the property exempt. The owner is no less a trespasser. (24 U. S. Stat. at Large, 1023 ; Ry. Co. v. Fisher, 116 U. S., 28.) The fact that Moore was a post trader furnishes him no claim to exemption. The above authorities are equally applicable to this question.

POTTER, CHIEF JUSTICE.

The plaintiff during the years 1890, 1891, and 1892 was a regularly licensed Indian trader and post trader, residing upon that part of the Shoshone Indian reservation used and occupied as a military post of the United States. During each of those years he owned cattle and horses which were kept, herded, and ranged upon said Indian reservation, with the consent of the Indians whom he paid for the privilege. In each of the years aforesaid said cattle and horses were regularly assessed for taxation in Fremont County, within whose boundaries said reservation is situated. This suit is brought to enjoin the collection of the taxes levied against said property. The questions reserved for our decision involve the tax powers of the State with respect to the property aforesaid.

It was held by this court, in Torrey v. Baldwin, 3 Wyo., 430, that the Shoshone Indian reservation was within the taxing jurisdiction of the Territory. The property taxed in that case was live stock grazing upon the reservation, which were owned by a person in no manner connected with either the Indians or the government of the United States. It was also held, in that case, that the

consent of the Indians to the occupation of the reservation by such property would not exempt it from territorial taxation. The same conclusion was afterward announced in Truscott v. Hurlbut Land & Cattle Co., 73 Fed., 60, which arose in Montana; and was a suit to enjoin the collection of taxes levied upon cattle of a corporation grazing upon lands of the Crow Indian reservation. The learned circuit judge, in the opinion, said: "The cattle here sought to be taxed, as has been said, were upon the reservation under lease from the Indians, sanctioned by act of Congress, and it is impossible to perceive that any of their just rights under the treaty and agreements with them on the part of the United States can be impaired by subjecting complainant's cattle to taxation. In reserving lands for the exclusive and undisturbed use of these Indians, and for others, who, with their consent and that of the United States, should occupy them, it was not the intention of Congress to establish an asylum into which persons other than the Indians, whether natural or artificial, can take their property, and hold it exempt from its just portion of the taxation necessary for the support of the government which gives it protection. For the protection of the complainant's cattle in all matters unconnected with the Indians, the authority of the State of Montana is available." The doctrine of Torrey v. Baldwin is also supported by Persons, etc., v. Territory (Ariz.), 26 Pac., 310, decided about the same time, which involved the right to tax the right of way of a railroad, constructed across an Indian reservation.

The taxing jurisdiction of the State is certainly no less extensive than was that of the Territory as concerns property upon such reservation. The act of 1893, ceding jurisdiction to the United States over military and Indian reservations, recognizes this principle by expressly reserving to the State the right to tax persons and corporations, their franchises and property, on said reservation.

We do not understand that counsel dispute the doctrine of the Torrey v. Baldwin case, in its general application.

It is, however, urged that the capacity in which the plaintiff resides upon the reservation; his character as a post and Indian trader, exempts his property from the taxing jurisdiction of the State. The argument is, in substance, that an Indian trader is an agent of the general government, and that such an agency is not subject to State taxation; and that as the power to tax includes authority to distrain for non-payment the rights of the Indians and of the United States would be interfered with, if the payment of a tax upon personalty should be so enforced.

The Supreme Court of the United States has frequently decided that a State tax upon the property of an agent of the government is not prohibited, merely because it is the property of such agent. Union Pac. R. R. Co. v. Peniston, 18 Wall., 5; Thomson v. U. P. R. R. Co., 9 Wall., 579; Central Pac. R. R. Co. v. California, 162 U. S., 91; Reagan v. Mercantile Trust Co., 154 U. S., 413, 416.

In Thomson v. Union Pac. R. R. Co. it was said, "No one questions that the power to tax all property, business, and persons, within their respective limits, is original in the States, and has never been surrendered. It can not be so used, indeed, to defeat or hinder the operations of the national government; but it will be safe to conclude in general, in reference to persons and State corporations employed in government service, that when Congress has not interposed to protect their property from State taxation, such taxation is not obnoxious to that objection."

In the opinion in U. P. R. R. Co. v. Peniston supra, we observe the following language: " It may, therefore, be considered as settled that no constitutional implications prohibit a State tax upon the property of an agent of the government, merely because it is such an agent." * * * " It is, therefore, manifest that exemption of federal agencies from State taxation is dependent, not upon the nature of the agents, or upon the mode of their constitution, or upon the fact that they are agents,

but upon the effect of the tax; that is, upon the question whether the tax does in truth deprive them of the power to serve the government as they were intended to serve it, or does hinder the efficient exercise of their power. A tax upon their property has no such necessary effect.''

It will be necessary to consider the character and functions of an Indian trader, in his relations both to the government and the Indians, to determine whether the tax in question has the effect contended for.

We believe that the first regulation by Congress of commerce with the Indians was the act of April 18, 1796. (Vol. 1, U. S. Stat. at Large, p. 452.) That act authorized the president to establish trading houses at such posts and places on the western and southern frontiers, or in the Indian country, as he should judge most convenient for the purpose of carrying on a liberal trade with the several Indian nations; and to appoint an agent for each trading house, whose duty should be to receive such goods as directed by the president, and to dispose of the same according to the rules prescribed by the president. The agent was required to take an oath faithfully to execute his trust, and to account for all money, goods, and other property coming into his hands. His accounts were to be made up half yearly and transmitted to the secretary of the treasury. Such agents were forbidden to be concerned in any business or trade on their own account. They were to be paid by the government.

With some variations in detail, this policy was continued until 1822, and on May 6th, of that year, an act was passed requiring the president to cause the business of the United States trading houses among the Indian tribes to be closed. (Vol. 3, U. S. Stat. at Large, p. 679.)

Until the going into effect of the act last aforesaid, from the time when the act of 1796 was put into operation, the government traded with the Indians upon its own account, through the agency of those selected to have charge of the several trading houses, and other

federal employees. All those engaged to superintend and control such commerce were in all respects officers or agents of the United States. The merchandise employed therein was furnished by and belonged to the government.

A very different policy was subsequently adopted. By the act of June 30, 1834, the Indian country was defined. It was also provided, in substance, that no person shall be permitted to trade with any of the Indians, in the Indian country, without a license therefor from the Superintendent of Indian Affairs, or Indian agent, or sub-agent. The licensee was required to give bonds conditioned upon a faithful observance of all the laws and regulations made for the government of trade and intercourse with the Indian tribes. Provision was made for a revocation of any such license, whenever the holder thereof should transgress any of such laws or regulations, or his further remaining in the Indian country should be deemed improper. A license could be refused if the applicant were a person of bad character, or if it was improper to permit him to reside in the Indian country, or if a former license to him had been revoked. It was made unlawful for any one other than an Indian, not possessing such a license, to reside in the Indian country or to trade therein. (Vol. 4, U. S. Stat., p. 729.)

With some slight amendments that is the present law upon the subject. Section 2128, Rev. Stat., is as follows:

" Any loyal person, a citizen of the United States, of good moral character, shall be permitted to trade with any Indian tribe upon giving bond to the United States in the penal sum of not less than five, nor more than ten thousand dollars, with at least two good sureties, to be approved by the superintendent of the district within which such person proposes to trade, or by the United States district judge or district attorney for the district in which the obligor resides, renewable each year, conditioned that such person will faithfully observe all laws and regulations made for the government of trade and intercourse with the Indian tribes, and in no respect violate the same."

Such a person, thus licensed, is permitted to reside in the Indian country, and carry on any trade not prohibited, with the Indians. The number of such licensees in any particular locality is not regulated, but the custom is, doubtless, in these days when Indians are confined to reservations, to limit such traders to one upon each reservation, or at each point where a trader is allowed. Such trader does not deal in goods furnished by the government, but trades upon his own account and for his own personal profit. He receives no compensation from the government, and seems to be under no duty or responsibility to it, except to observe all the laws and regulations made for the government of trade and intercourse with the Indians. He is not appointed an Indian trader, as that term is understood in respect to a selection for an official position, but he is permitted to trade with a certain Indian tribe, and to reside in the Indian country. The design of these enactments is plain. Stringent regulations are adopted concerning intercourse and trade with the Indians. That the national policy affecting them may be carried out with as little friction as possible, it has been found desirable to specify those who, in addition to the Indians themselves, shall be allowed to reside upon a reservation, or in the "Indian country," as the statutes still designate it, and to exclude all others under penalties and forfeitures. Nevertheless, the necessity was recognized of establishing some means whereby the Indians should have a convenient method of providing by trade for their wants, other than those cared for through the immediate agency of the government. To accomplish such purpose it is evident that the scheme was adopted of licensing persons to carry on trade with the Indians in their country under proper regulations. It is extremely doubtful if a licensed Indian trader is, in any correct sense, an officer or agent of the United States.

A merchant had been licensed by the supervising agent of the treasury department, during the late Civil war in this country, to trade with the federal army and the country within the federal lines in North Carolina, and had

paid the taxes required of such a licensee. The validity of a State tax upon his goods was brought in question before the courts of the State aforesaid. It was held, that the merchant was not an officer of the United States. That he was merely acting under a license from the authorities of the general government to trade on his own account and for his own profit, with the officers and soldiers of the army, and with the people of the surrounding country. For that privilege he paid a tax to the United States; but that did not prevent his liability to pay another tax to the State. (State v. Bell, Phillips N. C., 76, decided in 1867.)

A post trader is provided for under Section 1113, U. S. Rev. Stat., which reads as follows:

"The secretary of war is authorized to permit one or more trading establishments to be maintained at any military post on the frontier, not in the vicinity of any city or town, when he believes such an establishment is needed for the accommodation of emigrants, freighters, or other citizens. The persons to maintain such establishments shall be appointed by him, and shall be under protection and control as camp followers." The first act making such a provision, so far as we are aware, was passed in 1867. (Vol. 15, U. S. Stat., p. 29.) Its provisions were quite similar, in the main, to the existing statute, but said nothing about an appointment. In its present condition the statute was enacted July 15, 1870. It is entirely clear that a post trader, so-called, was authorized for the convenience of travelers and others on the frontier; and for that purpose he was given a residence at a military post and the protection which that would signify. His appointment by the secretary of war amounts to nothing more than a selection of the person who shall be permitted to maintain the authorized establishment. He is neither an officer nor an agent of the United States. Like an Indian trader, he trades upon his own account and for his own profit, purchasing and selling his own goods. He is not connected with the military arm of the government in any official capacity, but is under the protection thereof,

for the convenience of those citizens who may have secured homes upon the frontier, or may be traveling through a region sparsely settled, and otherwise unprovided with trading establishments.

We can perceive no reason why a post trader should be adjudged exempt from State taxation upon his property, otherwise taxable.

With respect to the property upon which the taxes complained of, were levied, it is alleged in the petition that it was located upon the Shoshone Indian Reservation with the consent of the Indians to whom the plaintiff paid for that privilege a sum of money equal to the taxes levied upon said horses and cattle. That during all that time, the plaintiff was Indian and post trader. It is not alleged that any part of the assessed property was employed by him in the trade which he conducted as such trader. Whether, if so used, that would constitute an exemption from State taxation, it is unnecessary, in this case, for the court to decide. It is, probably, reasonably to be inferred that the property in question was not connected with plaintiff's business as Indian trader, as he paid the Indians for the privilege of maintaining them upon the reservation. It would seem obvious that he would have a right, without such payment, to keep his merchandise and other property appertaining to his business as a licensed trader upon such reservation.

We are inclined to view the plaintiff, not as an agent of the government, but rather as one who is engaged in commerce with an Indian tribe, in the Indian country, by the permission, and under the regulations of the national government affecting such commerce. Trade or commerce with Indian tribes can not be molested by a State, any more than inter-state commerce. We are unable to discern in what manner a tax by the State authorities (to the same extent only as other like property is subjected to such burdens) upon the property of plaintiff mentioned and described in the petition as having been assessed and taxed, can operate to interfere with commerce with the

Indians. If the tax does not have that result, no rights of the Indians are impaired by it. Neither upon principle or authority, is it perceived how the tax complained of infringes upon any provision, or implication of the federal constitution. We are of the opinion that it does not.

From any consideration of the character of plaintiff's position or employment he is not hampered, in any respect, in the performance of his duties, or the enjoyment of any guaranteed privileges, by the imposition of the tax in question; nor would such duty or privileges be at all injuriously affected by an enforcement of the tax in a manner authorized by law.

The decision of the court upon the reserved questions is as follows :

First. The property of plaintiff mentioned in the petition, was subject to taxation by the taxing officers of Fremont County for the years 1890, 1891, and 1892.

Second. In case of non-payment of the taxes, the property can be distrained in the same manner, and to the same extent as other like property may be distrained under existing laws for like taxes.

Third. The fact that plaintiff was duly appointed, qualified, and acting Indian trader, at the Shoshone Indian Reservation, and duly licensed to carry on business therein, as such, does not exempt said property from such taxation.

Fourth. That said property was on the reservation with the consent of the Indians, whom the plaintiff paid for the privilege, as alleged in the petition, does not exempt said property from such taxation.

Fifth. The fact that plaintiff was a post trader at Fort Washakie, a military post on said reservation, does not operate to exempt said property from such taxation.

Sixth and Seventh. These questions, except as they concern the particular property referred to in the petition, are not involved in this controversy. As to such property the questions have already been answered.

The above fully answers the eighth and ninth questions so far as they are applicable to the case at bar.

Bramel, District J., concurs.

Corn, J., did not sit being disqualified.    Bramel, Dist. J., sat in his stead.

Knight, J., did not sit, it having been submitted before he became a member of this court.