[Civil No. 300.   Filed February 9, 1891.]

[26 Pac. 310.]

THE TERRITORY OF ARIZONA, Plaintiff and Appellee, v. THE DELINQUENT TAX-LIST OF THE COUNTY OF MARICOPA FOR THE YEAR 1888. MARICOPA AND PHŒNIX RAILROAD COMPANY, Defendant and Appellant.

1. TAXATION—PROPERTY WITHIN EXCLUSIVE JURISDICTION OF UNITED STATES—CANNOT BE TAXED BY TERRITORIES.—Property situate wholly within boundaries exclusively within the jurisdiction of the legislative power of the United States cannot be taxed by the territory within which it may be situate.

2. INDIANS—RESERVATIONS—PART OF TERRITORY—SUBJECT TO LEGISLATIVE AND JUDICIAL CONTROL—REV. STATS. U. S. (ORGANIC ACT) 1878, SECS. 1839, 1840, CITED AND CONSTRUED.—In absence of treaty or other express exclusion an Indian reservation becomes part of the territory for legislative and judicial control, subject, however, to the power of the general government to make regulations respecting the Indians, etc. Statutes, *supra*, cited and construed.

3. TAXATION—PROPERTY WITHIN INDIAN RESERVATION.—A railroad-track and the right of way, granted by the government with the consent of the Indians, within an Indian reservation, not expressly excluded from territorial jurisdiction, is subject to taxation by the territory.

APPEAL from a judgment of the District Court of the Second Judicial District in and for the County of Maricopa. Joseph H. Kibbey, Judge. Affirmed.

The facts are stated in the opinion.

H. N. Alexander, for Appellant, The Maricopa and Phœnix Railroad Company.

The Indian reservations are by law excepted from the jurisdiction of all territories, and are not subject to their laws,—in fact, so far as state and territorial laws are concerned, stand in the position of a foreign country, and are only subject to the control of the United States government and the laws of Congress. U. S. Rev. Stats., title 23, ch. 1, secs. 1839-1840.

The Pima and Maricopa Indians have never signified their assent to the President of the United States to be embraced within territorial jurisdiction of this particular territory,— i. e., the territory of Arizona. Therefore the territory has no rights or jurisdiction over property within the boundaries of their reservation.

"So long as the tribal organization of Indian bands continue, and the United States recognizes their national character, they act under the protection of the treaties and laws of Congress, and their property is withdrawn from the operation of state laws." Meyer's Fed. Dec., vol. 27, p. 220; *Harkness* v. *Hyde,* 98 U. S. 47.

In the case here the easement is granted to a particular person—the public or other person have no right in the easement. It is a particular easement for a particular purpose, ending with the purpose, or when Congress sees fit to repeal the act. It then reverts back to the grantors, the Indians or the United States, as the case may be. No tax-lien can exist in such case for the reason that there are no means by which the lien can be foreclosed or sold. A tax-lien cannot be fixed on the lands of the United States or on the lands of the Indians so long as they belong to or have tribal relations.

This court has no jurisdiction to enforce the payment of this tax. This land is part of lands over which the United States has exclusive jurisdiction, the same as dockyards, arsenals, forts, etc., and only district or circuit courts of the United States have jurisdiction, or courts of a territory while sitting with the jurisdiction of such courts, as provided by section 1910 of the Revised Statutes of the United States. No law can reach over the reservations of Indians, except a law of Congress, and in all cases these are the only courts that can have jurisdiction to try cases arising under the laws of the United States. A territorial law cannot reach into or over an Indian reservation; the territories are prohibited from exercising any jurisdiction over them; they are as if they were without the boundaries of the territory. "They shall be excepted out of the boundaries and constitute no part thereof." 2 Blackwell on Tax Titles, pp. 758-766; *Douglass County Commissioners* v. *Union Pacific R. R. Co.,* 5 Kan. 615; *Moore* v. *County Commissioners,* 2 Wyo. 14.

"As long as the United States recognizes the national character of the Indians, they are under the protection of treaties and the laws of Congress, and their property is withdrawn from the operation of state laws." *Kansas Indian Cases,* 5 Wall. 755-756-757-760-761; *New York Indians,* 5 Wall. 761; *United States* v. *Berry,* 2 McCrary, 68-71, 4 Fed. 779; *Burgess* v. *Territory,* 8 Mont. 57, 19 Pac. 561, 562; *Scott* v. *United States,* 1 Wyo. 40; *Brown* v. *Ilges,* 1 Wyo. 202; *United States* v. *Stahl,* 1 Woolw. 192, 1 Kan. 606, 1 McCahon, 206, Fed. Cas. No. 16,373; *Swope* v. *Purdy,* 1 Dill. 349, Fed. Cas. No. 13,704; *Ex parte Reynolds,* 5 Dill. 394, Fed. Cas. No. 11,719; *United States* v. *McBratney,* 104 U. S. 622, 623, 624; *Fort Leavenworth R. R. Co.* v. *Lowe,* 114 U. S. 525, 5 Sup. Ct. Rep. 995.

Clark Churchill, Attorney-General, and Frank Cox, District Attorney, for Appellee.

GOODING, C. J.—The territory of Arizona, appellee, recovered judgment against the Phœnix and Maricopa Railroad Company, appellant, in the court below for taxes on that part of the Phœnix and Maricopa Railroad lying within the boundaries of the Gila River Indian Reservation, in this territory. It is claimed by appellant that the territory has no jurisdiction within the said reservation, or legislative control over, and consequently no power to tax, property situate therein. If the reservation is to be considered as exclusively under the jurisdiction of the United States, the same as places purchased by the United States within the boundaries of states, and with the consent of said states, and for the purpose of forts, arsenals, magazines, dock-yards, etc., as seems to be assumed by appellant, then the contention of appellant would be supported by a great weight of authority, and would prevail in this case, provided the proposition applied to a railroad track, part of which is situate within and part without the boundaries of the reservation. In other words, we conceive it to be the law that property situate wholly within boundaries exclusively within the jurisdiction of the legislative power of the United States cannot be taxed by the territory within which it may be situate. But is the reservation within or outside of the legislative control of this territory?

The Organic Act provides as follows: "Sec. 1839. Nothing in this title shall be construed to impair the rights of personal property [should be 'persons or property'] pertaining to the Indians in any territory, so long as such rights remain unextinguished by treaty between the United States and such Indians, or to include any territory which, by treaty with any Indian tribe, is not, without the consent of such tribe, embraced within the territorial limits or jurisdiction of any state or territory; but all such territory shall be excepted out of the boundaries, and constitute no part of any territory now or hereafter organized until such tribe signifies its assent to the president to be embraced within a particular territory. Sec. 1840. Nor shall anything in this title be construed to affect the authority of the United States to make any regulations respecting the Indians of any territory, their lands, property, or rights, by treaty, law, or otherwise, in the same manner as might be made if no temporary government existed, or as hereafter established in any such territory." Section 1839 provides, in short, that where there is a treaty with an Indian tribe, providing that they shall not be included in any territory without their assent expressed to the president, they shall not be included until their assent is given. If there exists a treaty between the government of the United States and the Pima and Maricopa Indians containing such a provision, then their reservation is outside of the political jurisdiction of this territory. If there is no such treaty, and there is no act of Congress excepting their reservation out of the operation of the Organic Act, then it would seem that the reservation becomes a part of the territory for legislative and judicial control. Section 1840 provides that nothing contained in this title shall be construed to affect the authority of the United States to make any regulations respecting the Indians of the territory, their lands, property, or rights, etc. Thus it will be seen that the authority of the United States over the Indians is not to be interfered with by the territory. Of course, so long as it is a territory, the authority of Congress is paramount in and outside of the reservation. But this does not prevent the exercise of the territorial legislative functions in or outside of the reservation. In the absence of treaty or other express exclusion,

the reservation becomes a part of the territory, subject, however, to the power of the general government to make regulations respecting the Indians, etc.

There is nothing to show, nor does the court know judicially or otherwise, that there ever was any treaty between the government and the Indian tribe or tribes on the reservation. The case in 102 U. S. 145, (*Langford* v. *Monteith*,) is directly in point. We make the following quotations: ''Langford, the plaintiff in error, who was plaintiff below, brought an action before a justice of the peace in the nature of forcible detainer, to recover of Charles E. Monteith the possession of buildings and grounds occupied by the latter under the agent for the United States for the Nez Perce Indians.'' Passing the first ground of defense, the opinion says: ''Another allegation of the defense is that the property is situated within an Indian reservation, to which the Indian title has never been extinguished, and therefore forms no part of the territory of Idaho. Of course, if this latter allegation be true, neither the justice of the peace before whom the case was tried first, nor the district court to which it afterwards came by appeal, had any jurisdiction over it. The opinion of this court in *Harkness* v. *Hyde*, 98 U. S. 476, is relied on by the defendant. The principle announced in that case is sound, namely, that when, by an act of Congress organizing a territorial government, lands are excepted out of the jurisdiction of the government thus brought into existence, they constitute no part of such territory, although they are included within its boundaries. Congress, from which the power to exercise the new jurisdiction emanates, has undoubted authority to exclude therefrom any part of the soil of the United States, or of that whereto the Indians have the possessory title, when by our solemn treaties with them a stipulation to that effect had been made.'' The opinion further says: ''This court in *Harkness* v. *Hyde*, 98 U. S. 476, relying upon an imperfect extract found in the brief of counsel, inadvertently inferred that the treaty with the Shoshones, like that with the Shawnees, contains a clause excluding the lands of the tribe from territorial or state jurisdiction. In this case it seems we were laboring under a mistake. Where no such clause, or language equivalent to it, is found in a treaty with

Indians within the exterior limits of Idaho, the lands held by them are a part of the territory, and subject to its jurisdiction, so that process may run there, however the Indians themselves may be exempt from that jurisdiction. As there is no such treaty with the Nez Perce tribe, on whose reservation the premises in dispute are situated, and as this is a suit between white men, citizens of the United States, the justice of the peace had jurisdiction of the parties, if the subject-matter was one of which he could take cognizance." The title to real estate having been raised, it was held that he had not jurisdiction of the subject-matter. This is a decision of the supreme court of the United States to the effect that, in the absence of treaty stipulation, a justice of the peace would have jurisdiction over persons and property on a reservation. The Idaho act was substantially, and almost literally, the same as the Organic Act of this territory in that particular. In *United States* v. *McBratney*, 104 U. S. 621, it is held that the circuit court of the United States for the district of Colorado had no jurisdiction to try a white man for the murder of a white man on the Ute reservation, in the state of Colorado. There a treaty existed between the United States and the Ute Indians, and among other provisions there was the provision "that a certain district of country therein described should be set apart for the absolute and undisputed use and occupation of the Indians therein named, . . . and that no persons except those therein authorized so to do, and except such officers, agents, and employees of the government as might be authorized to enter upon Indian reservations in discharge of the duties enjoined by law, should ever be permitted to pass over, settle upon, or reside in the territory so described, except as otherwise provided in the treaty." The act admitting Colorado into the Union as a state provided for its admission upon an equal footing with the original states in all respects whatsoever. It was held that this language, notwithstanding the treaty, subjecting the reservation to the state jurisdiction, transferred the jurisdiction to try the defendant for murder within the reservation to the state court, the reservation not being expressly excepted out of the state jurisdiction. In *United States* v. *Ward*, 1 Woolw. 17, 1 Kan. 601, McCahon, 199, Fed. Cas. No. 16,639, the circuit

court held that the state courts had no jurisdiction in the lands of the Shawnees. But there was a treaty that their lands should never be brought within the bounds of any state or territory, or subject to the laws thereof.

The appellant is evidently misled by failing to note the distinction between reservations with treaties providing against their being included in territorial and state jurisdictions and reservations having no such treaty stipulation. But, even if there had been such treaty stipulation, a subsequent act of Congress in conflict with it would prevail over it. *Cherokee Tobacco,* 11 Wall. 621, says: "A treaty may supersede a prior act of Congress, and an act of Congress may supersede a prior treaty." But appellant cites a number of cases holding the authority of the United States to be exclusive in certain places and districts, and denying the authority of state or territory therein. These cases are, however, a class unto themselves, and come under a provision of the constitution of the United States. The provision is as follows: "Congress shall have power to exercise exclusive legislation in all cases whatsoever over such district (not exceeding ten miles square) as may, by cession of particular states and the acceptance of Congress, become the seat of the government of the United States, and exercise like authority over all such places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings." The origin and effect of this provision is somewhat curious and interesting. The origin and scope of the provision is to be found in *Railroad Co.* v. *Lowe,* 114 U. S. 529, 5 Sup. Ct. Rep. 995. It is there said: "The necessity of the supreme legislative authority over the seat of government was forcibly impressed upon the members of the constitutional convention by occurrences which took place near the close of the revolutionary war. At that time, while Congress was in session in Philadelphia, it was surrounded and insulted by a body of mutineers of the continental army." In giving an account of this proceeding, Mr. Rawle, in his treatise on the constitution, says of the action of Congress: "It applied to the executive authority of Pennsylvania for defense, but, under the ill-conceived constitution of the state at that time, the executive power was

vested in a council consisting of thirteen members, and they possessed or exhibited so little energy and such apparent intimidation that the Congress indignantly removed to New Jersey, whose inhabitants welcomed it with promises of defending it. It remained for some time at Princeton without being again insulted, till, for the sake of greater convenience, it adjourned to Annapolis. The general dissatisfaction with the proceedings of the executive authority of Pennsylvania, and the degrading spectacle of a fugitive Congress, suggested the remedial provisions now under consideration."

The effect and scope of this constitutional provision is illustrated in a number of cases, extracts from several of which are set out in 114 U. S. 528, 5 Sup. Ct. Rep. 997, which case is cited and relied upon by appellant. We will notice a few of these cases, and it will be readily seen that they are very different from the case under consideration. In *Commonwealth* v. *Clary,* 8 Mass. 72, "the supreme court of Massachusetts held that the courts of the commonwealth could not take cognizance of offenses committed upon lands in the town of Springfield purchased with the consent of the commonwealth by the United States, for the purpose of erecting arsenals upon them. That was the case of a prosecution against the defendant for selling spirituous liquors on the lands without a license, contrary to a statute of the state, but the court held that the law had no operation within the lands mentioned. 'The territory,' it says, 'on which the offense charged is agreed to have been committed is the territory of the United States, over which the Congress have the exclusive power of legislation.' " In *Mitchell* v. *Tibbetts,* 17 Pick. 298, it was held "that a vessel employed in transporting stone from Maine to the navy-yard in Charleston, Mass., a place purchased by the United States with the consent of the state, was not employed in transporting stone within the commonwealth, and therefore committed no offense in disregarding the statute making certain requirements of vessels thus employed." The court said: "To bring a vessel within the description of the statute, she must be employed in landing stone at, or taking stone from, some place in the commonwealth, and that the law of Massachusetts did not extend to and operate within the territory ceded; adopting the principle of its previous decision in

8 Mass." "In *Sinks* v. *Rees*, 19 Ohio St. 306, 2 Am. Rep. 397, the question came before the supreme court of Ohio as to the effect of a proviso in an act of that state ceding to the United States its jurisdiction over land within her limits for the purposes of a national asylum for disabled volunteer soldiers, which was that nothing in the act should be considered to prevent the officers, employees, and inmates of the asylum who were qualified voters of the state from exercising the right of suffrage at all township, county, and state elections in the township in which the national asylum should be located; and it was held that upon the purchase of the territory by the United States, with the consent of the legislature of the state, the general government became invested with exclusive jurisdiction over it and its appurtenances, in all cases whatsoever, and that the inmates of said asylum resident within the territory being within such exclusive jurisdiction, were not residents of the state so as to entitle them to vote, within the meaning of the constitution which conferred elective franchise upon residents alone."

But these cases are clearly distinguishable from this case. They come within the provision of the constitution conferring exclusive jurisdiction "over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings.". The reason and purpose of the exclusive jurisdiction in such places does not exist on Indian reservations. Story, in his Commentaries on the Constitution, says: "If there has been no cession by the state of the place, although it has been constantly occupied and used, under purchase or otherwise, by the United States for a fort or arsenal, or other constitutional purpose, the state jurisdiction still remains complete and perfect;" and in support of his statement refers to *People* v. *Godfrey*, 17 Johns. 225. In that case the court says: "If the United States had the right of exclusive legislation over the fortress of Niagara, they would have also exclusive jurisdiction. But we are of opinion that the right of exclusive legislation within the territorial limits of any state can be acquired by the United States only in the mode pointed out in the constitution,—by purchase by consent of the legislature of the state in which the same shall be,—for

the erection of forts, magazines, arsenals, dock-yards, and other needful buildings. The essence of that provision is that the state shall freely cede the particular place to the United States for one of the specific and enumerated objects." ". . . Where, therefore, lands are acquired in any other way by the United States within the limits of the state than by purchase with her consent, they will hold the lands subject to this qualification; that if upon them forts, arsenals, or other public buildings are erected for the uses of the general government, such buildings, with their appurtenances, as instrumentalities for the execution of its powers, will be free from any such interference and jurisdiction of the state as would destroy or impair their effective use for the purposes designed." Appellant contends that the owner of the right of way is the Indians, says so in express terms, and says: "You can't tax it, and no lien can exist on such land." The right of way is distinct from the ownership of the soil. The government has granted the right of way, and the Indians have consented to it. That they have no title to the soil, but a mere occupancy, is well settled. In *Johnson* v. *McIntosh*, 8 Wheat. 574, it is decided that the title to the soil is in the sovereign, though the land may be in the occupancy of the Indian tribes; that the right of the Indians consists in the right of occupancy, and does not interfere with the transfer of the soil by the sovereign or its grantees. This conclusion is reached after a careful and exhaustive review of the whole subject, in a case where the grantee of the Indian title held by a perfect title, if the Indians could acquire and convey a good title to the soil. But it is argued that the land belongs to the Indians upon and over which the track and improvements exist, and cannot be sold for taxes. That the rights of the Indians, whatever they may be, cannot be sold for taxes, is quite clear. The proceeding is not to sell anything not belonging to appellant. The track of the railroad, and its right of way, is charged with the taxes assessed against it, and only the property upon which the charge exists is liable to sale, and the title to no other property would pass thereby. That the railroad track and right of way may be sold for taxes is, we think, too obvious to require argument or citation of authority. That part of it within the reservation may, in our opinion, be fairly considered as subject

to taxation by reason of the grant of the government and the consent of the Indians, and as being a part of a great public highway for railroad purposes, independent of the question of general jurisdiction, above discussed and decided. The item of interest from May 6, 1889, to February 6, 1890, amounting to $106.20, being interest on taxes, is disallowed. There is no other error, and judgment will be entered for the proper amount.

Kibbey, J., and Sloan, J., concur.