HON. FRANK DALE, CHIEF JUSTICE.
HON. HENRY W. SCOTT,
HON. A. G. CURTIN BIERER,
HON. JNO. L. M'ATEE,
HON. JOHN C. TARSNEY,
} ASSOCIATE JUSTICES.

## D. P. GAY *et al.* v. A. M. THOMAS *et al.*

1. TAXATION—*Power of Legislature in Imposing—Extent of.* The power of taxation is not an arbitrary power, nor can it be exercised capriciously. It is h dged about and restricted by wise constitutional limitations and fixed general rules. These constitutional limitations and general rules are designed to secure a just apportionment of the burdens of government by requiring uniformity of contributions, levied by fixed and general rules and apportioned by the law, according to some uniform measure of equality. Within these rules and limitations the authority and power of the legislative department is absolute and conclusive.

2. SAME—*Legislative Discretion in.* The discretion of the legislature in matters of taxation, is very broad and its exercise may work injustice and oppression. The judicial cannot prescribe to the legislative department of the government limitations upon the exercise of its acknowledged powers. The power to tax may be exercised oppressively, but if it does not clearly violate some estab-

lished rule or limitation, the responsibility of the legislature is not to the courts but to the people by whom its members are elected.   The courts can only interfere when the conclusion is unavoidable that the legislature has transcended its powers or clearly violated some constitutional or other fixed general rule, defining or limiting such powers.

3. INDIAN RESERVATIONS—*Taxation of Property Therein.*   In the absence of any provisions or stipulations in the the treaties by which the Indians were settled on the reservations in this territory, that the lands in such reservations should not, without consent of the Indians occupying them, be included within the limits or jurisdiction of any state or territory that might, thereafter, be created and which should include such reservation within its exterior boundaries, the authority of the territory may extend over such reservation in all matters of rightful legislation, not interfering with the persons or property of the Indians under the protection of the United States.   As to all matters and subjects of rightful legislation, not interfering with that protection and not otherwise repugnant to the constitution and laws of the United States, the legislative power of the territory is as absolute in and upon these reservations, as in any other part of this territory.

4. SAME—*Taxation of Property on.*   Taxation is a rightful subject of legislation. It is the duty of the territorial legislature to apportion the burdens of government upon all property within the territory, not withdrawn from its jurisdiction by the Organic Act or otherwise exempted.   The property of United States citizens, not connected with the Indians kept upon these reservations, is a part of the mass of property within the territory receiving the protection of its laws and subject to taxation.   It was, therefore, the right and duty of the legislature, to subject such property to taxation.

5. SAME—*Taxation of Cattle of Citizens on Indian Reservations not an Impairment of the Rights of the Indians.*   Taxation of cattle of white men kept and grazed upon Indian reservations under leases from the Indians, is not a taxation of any right of property of the Indians.   The taxation in controversy in this case was not assessed or levied upon the real estate or upon the rents of real estate belonging to the Indians and was therefore not invalid as interfering with the property rights of the Indians under the protection of the United States and withdrawn from the jurisdiction of the territory nor obnoxious to the principle of *Pollock v. Farmers' Loan and Trust Company,* 157 U. S. 429, even if the constitutional provision governing that case was operative upon any other legislative body than the congress of the United States or in the raising of revenue for any other government than the Federal government, which it was not.

6. TAXING DISTRICTS—*Established by Legislature, not by Courts.*   The establishing of taxing districts is a legislative, not a judicial function.   The taxing district comprising the county of Kay and the attached Indian reservations and unorganized country, was not created by the order of the supreme court, attaching such Indian reservations and unorganized country to Kay county for judicial purposes, but by the act of March 5, 1895.   The supreme court attached such territory to Kay county for judicial purposes and the legislature adopted and made the district thus created a taxing district.

7. TAXATION—*Discrimination Between Classes of Property, What is Not.* An act providing for the taxation of personal property alone in a district where there is no real estate subject to taxation is not invalid as discriminating in taxing different kinds of property. Courts will take judicial knowledge of the treaties of the United States with Indian tribes and from those treaties that the title to the lands in the Indian reservations in this territory is in the Indian tribes, or in the United States for the benefit of the Indians, and that there is no real estate therein subject to taxation.

8. SAME—*Purposes of Validity.* Taxation must be for purposes in which the people taxed have a legal interest. Property which is located upon an Indian reservation and which is attached to a county of the territory for judicial purposes but is not within the geographical boundaries of the county and is not a part of the county for municipal purposes and in which the people thereof have no voice in the selection of the county and other officers and no part of the fund derived from the taxes levied can be expended for the purposes for which they were levied within such Indian reservation, and which taxes when collected are to be appropriated entirely to the expenses of the county roads, and schools within the organized county, cannot be taxed for the various county, school, and road purposes of such county. The property on such reservation can only be taxed for territorial and judicial purposes.

9. LAWS—*Special, What Are.* See *Daily Leader v. Cameron*, 3 Okla. 677.

10. TAXATION—*Assessment, Uniformity as to Time of.* An act providing for listing and assessing personal property in Indian reservations and unorganized territory, at a different time from that fixed for listing and assessing such property in organized counties, is not invalid for want of uniformity. Taxes must be assessed according to some uniform rule; but this does not mean that the time and method of assessment shall be identical, but only that after the legislature has declared what classes of property shall be subject to taxation, the tax itself shall be levied upon such property or the owner thereof according to a uniform rate of valuation.

## *Error from the District Court of Kay County.*

### STATEMENT OF FACTS.

The plaintiffs in error are non-residents of the Territory of Oklahoma and owners of large herds of cattle that were kept and grazed, during a portion of the year 1895, in parts of the Osage Indian reservation in this territory.

The defendants in error are the board of county commissioners, treasurer and sheriff of Kay county, Oklahoma Territory.

On the third Monday in February, 1894, the supreme court of the Territory of Oklahoma, by an order entered on the journals of said court, attached to said county of Kay, for judicial purposes, all the Kaw or Kansas Indian reservation and all of the Osage Indian reservation, north of the township line dividing townships 25 and 26, north. All of said reservations, so attached to said Kay county, for judicial purposes, by such order, are without the boundaries of said Kay county, as established by the secretary of the interior, and are not within the boundaries of any organized county of this territory. Said territory, so attached to said county of Kay, for judicial purposes, is comprised wholly of lands owned and occupied by Indian tribes and consists, principally, of wild, unimproved and unallotted lands, used for grazing purposes ; that plaintiffs in error, during the year 1895, and during the month of April of said year, drove, transported and shipped to the ranges and pastures in that part of said Osage Indian reservation, attached to said Kay county, for judicial purposes, as aforesaid, large herds and numbers of cattle, which were taken on to said reservation in pursuance of and by virtue and authority of certain leases to plaintiffs in error, for grazing purposes, made by the Osage tribal government under the supervision of the agent in charge of said tribe, and upon the ratification and approval of the commissioner of Indian affairs and of the secretary of the interior. And said cattle of said plaintiffs in error were, on the first day of May, kept and grazed on that part of said Indian reservation attached to said Kay county, for judicial purposes, as aforesaid.

By an act approved March 5, 1895 the legislative assembly of the Territory of Oklahoma amended § 13, art. 2, ch. 7 of the Oklahoma Statutes, relating to revenue,

so that the same reads as follows: "That when any cattle are kept or grazed or any other personal property is situated in any unorganized country, district or reservation of this territory, such property shall be subject to taxation in the organized county to which said country, district or reservation is attached for judicial purposes," and authorized the board of county commissioners of the organized county or counties to which such unorganized country, district or reservation is attached, to appoint a special assessor each year, whose duty it should be to assess such property, and conferred upon such special assessor all the powers and required him to perform all the duties of a township assessor. The assessor so provided for was required to begin and perform his duties between the first day of April and the twenty-fifth day of May of each year, and to complete his duties and return his tax lists on or before June 1, and the property therein authorized to be assessed, it was provided, should be valued as of May 1, each year.

In pursuance of the provisions of said act the county commissioners of said Kay county did duly appoint a special assessor for the year 1895, to assess such cattle as were kept and grazed, and any other personal property situated in the unorganized country and parts of Indian reservations attached to said Kay county for judicial purposes, and said special assessor did, by virtue of said appointment, assess all the personal property in the territory so attached to the county of Kay for judicial purposes, including all of the cattle of the said plaintiffs in error kept and grazed in said reservation on the first day of May, 1895. The said special assessor assessed the property of these plaintiffs in error so located on said territory attached to said county of Kay for judicial purposes

as aforesaid, and returned the same upon an assess-ment roll at the total valuation of $760,469; that there-after the said sum was, by the clerk of said county, car-ried into the aggregate assessment for said county, and by him certified to the auditor of the territory; that the territorial board of equalization, in acting upon the various assessments of the various counties, as certified to said board, raised the aggregate valuation of the prop-erty returned for taxation upon the tax rolls of said county of Kay, 35 per cent, and the county clerk for said county carried out the raised valuation so certified to him by said territorial board of equalization against the property of these plaintiffs in error, and made the ag-gregate valuation of such property $1,026,634.

Thereafter the territorial board of equalization levied and duly certified to the county clerk of the county of Kay tax levies, for territorial purposes for the year 1895, as follows:

General revenue, three mills on the dollar.
University fund, one-half mill on the dollar.
Normal school fund, one-half mill on the dollar.
Bond interest fund, one-half mill on the dollar.
Board of education fund, one-half mill on the dollar.

That the board of county commissioners for the county of Kay made the following levies for the year 1895:

For salaries, five mills on the dollar.
For contingent expenses, three mills on the dollar.
For sinking fund, one and one-half mills on the dollar.
For court expenses, two and one-half mills on the dollar.
For county supplies, three mills on the dollar.
For road and bridge fund, two mills on the dollar.
For poor fund of said county, one mill on the dollar.
For county school fund of said county, one mill on the dollar.

The county clerk of said county of Kay carried the valuation of the property of these plaintiffs in error upon the tax rolls of said county and against the same extended the levies as aforesaid and charged against the property of these plaintiffs in error in the aggregate the sum of $26,174.16.

Before these taxes became delinquent, plaintiffs in error began to remove or attempted to remove their respective property from the territory attached to Kay county for judicial purposes, and beyond the limits of Oklahoma Territory. The treasurer of said Kay county issued tax warrants for the several amounts of taxes levied against the property of each of said plaintiffs in error and delivered the same to the sheriff of said county for execution. Said sheriff seized certain property of each of plaintiffs in error by virtue of such tax warrants. The plaintiffs in error filed their several petitions in the district court of Kay county and on application obtained injunctions, restraining the defendants in error from making any further attempt to collect such taxes. Afterwards, on motion, the several actions were consolidated into one. To the petition, filed in such consolidated action, the defendants in error filed a general demurrer. At the hearing the district court sustained the demurrer in part and overruled it in part, holding that all of the levies made for territorial purposes and the county levy for court expenses, were valid; and as to those levies, the injunction was dissolved, and as to all of the other county levies, such injunctions were made perpetual. From that part of the order and judgment of the court dissolving the injunction as to the territorial taxes and the one county fund levy, plaintiffs appealed. From that part perpetuating the injunction as to all of the county levies,

except that for court expenses, the defendants appealed, and filed their cross-petition in error, and the case is thus here for review.

*Henry E. Asp, John W. Shartel* and *J. R. Cottingham*, for plaintiffs in error.

*C. A. Galbraith, Attorney General*, and *D. L. Weir*, for defendants in error.

The opinion of the court was delivered by

TARSNEY, J.: The questions involved are of great public and private interest and have received from us that very careful consideration and attention which their importance demands.

By § 6 of the Organic Act of the territory, it is provided:

"That the legislative power of the territory shall extend to all rightful subjects of legislation, not inconsistent with the constitution and laws of the United States, but no law shall be passed interfering with the primary disposal of the soil; no tax shall be imposed on the property of the United States nor shall the lands or other property of non-residents be taxed higher than the lands or other property of residents, nor shall any law be passed impairing the right to private property, nor shall any unequal discrimination be made in taxing different kinds of property, but all property subject to taxation shall be taxed in proportion to its value."   *   *

A broader grant of legislative power than that contained in this section could hardly be conceived of. This Organic Act of the territory defined its boundaries, created a government which comprised a legislative department, vested with power of legislating upon all rightful subjects of legislation and co-extensive with the exterior boundaries of the territory. The taxing power

is a part of the legislative power of government and taxation is a rightful subject of legislation. Taxes are the enforced contributions upon persons or property levied by the government by virtue of its sovereignty for the support of government and for public needs. The citizen pays from his property the portion demanded in order that by means thereof he may be secured in the enjoyment of the benefits of organized society. The power is unlimited in its reach as to subjects; in its very nature, it acknowledges no limit; it is sometimes said that in its exercise it may become a power to confiscate or destroy, but this must be thus qualified, that under our system of constitutional governments it differs from the forced contributions, loans and benevolences of arbitrary and tyrannical governments. It is not an arbitrary power, nor can it be exercised capriciously. It is hedged about and restricted by wise constitutional limitations and fixed general rules. These constitutional limitations and general rules are designed to secure a just apportionment of the burdens of government by requiring uniformity of contributions, levied by fixed general rule, and apportioned by the law according to some uniform measure of equality.

Within these rules and limitations the authority and power of the legislative department is absolute and conclusive.

The ends sought to be reached by these general and fundamental rules and constitutional restrictions upon upon the powers of taxation are equality, uniformity and justice in apportioning the burdens of government; but as the idea of exact equality, uniformity and justice under any system of human laws being attainable is Utopian, it is not expected that such exactness can be attained in the

exercise of the powers of taxation. Notwithstanding such fixed general rules and limitations, the discretion of the legislature is very broad and its exercise may work injustice and oppression. If such discretionary power be threatened with abuse, security must be found in the responsibility of the legislature that imposes the tax to the constituency that elected them. The judicial cannot prescribe to the legislative department of the government limitations upon the exercise of its acknowledged powers. The power to tax may be exercised oppressively upon persons or with regard to property, but if it do not clearly violate some established rule of limitation, the responsibility of the legislature is not to the courts but to the people by whom its members are elected. The courts can only interfere when the conclusion is unavoidable, that the legislature has transcended its powers or clearly violated some constitutional or other fixed general ruling defining or limiting such power. (*Veazie Bank v. Fenno*, 8 Wall. 548; *Weston v. Charleston*, 2 Peters, 449-466; *Lane County v. Oregon*, 7 Wall. 71; *Tallman v. Butler*, 12 Iowa, 531.)

Our inquiry then is, did the legislature, by the act of 1895, under authority of which the taxes in controversy were assessed and levied, transcend its powers, and is such act a violation of any constitutional or other fixed general rule controlling the discretion of the legislature?

The only limitation or restriction upon the taxing power of the legislature, which I find in the Organic Act for the territory is that contained in §6 of said act, which is as follows:

"No tax shall be imposed on the property of the United States, nor shall the lands or other property of non-residents be taxed higher than the lands or other property of residents, nor shall any law be passed impairng

the right to private property, nor shall any unequal discrimination be made in taxing different kinds of property, but all property subject to taxation shall be taxed in proportion to its value."

And the following provision in § 1 of said act.

" Provided, that nothing in this act shall be construed to impair any right now pertaining to any Indians or Indian tribe in said territory under the laws, agreements and treaties of the United States, or to impair the rights of person or property pertaining to said Indians, or to affect the authority of the government of the United States to make any regulation or to make any law respecting said Indians, their lands, property or other rights which it would have been competent to make or enact if this act had not been passed."

If, therefore, there be any restriction or limitation upon the power of the legislature to tax the property of plaintiffs or which makes such taxation invalid, it must be found in these provisions of the Organic Act or in the constitution, treaties or legislation of the United States, or some general rule inherent in our system of government. It is not contended that the act under which these taxes are sought to be imposed is obnoxious to any provision of the Federal constitution, but it is contended by plaintiffs that the legislature has no jurisdiction to enact laws, especially tax laws, and put the same in force in these Indian reservations. The argument being that although these reservations are within the exterior boundaries of Oklahoma Territory, yet they comprise no part of the territory for territorial governmental purposes, but are exclusively under the jurisdiction of the United States, and that the legislative power of the territory does not extend over them. It is conceded by counsel for plaintiffs that the treaty under which the Osage Indians were settled on these lands contained no

provision or stipulation by which said Indian tribe or the lands occupied by them were not, without their consent, to be included within the limits or jurisdiction of any state or territory that might thereafter be created and which should include such reservation within its exterior boundaries. That there was at the time the Organic Act, creating the Territory of Oklahoma, was passed, and at the time the act of 1895, authorizing the taxation in controversy was enacted, and at the time these taxes were assessed and levied, no treaty with the Osage Indian tribe that the lands or any part thereof, within this reservation, should be thus excluded from the limits and jurisdiction of any state or territory.

I think there is no proposition better settled by authorities than that, in the absence of such treaty stipulation, the authority of the territory may rightfully extend over such reservation in all matters of rightful legislation, not interfering with the persons and property of the Indians within such reservation, under the protection of the laws and authority of the United States; and that as to all matters and subjects of rightful legislation, not interfering with that protection, and not otherwise repugnant to the constitution and laws of the United States, the legislative power of the territory is absolute. (*Utah & Northern Railway v. Fisher*, 116 U. S. 28; *Langford v. Monteith*, 102 U. S. 145; *Phœnix and Maricopa R. R. Co., v. Arizona Territory*, Sup. Court of Ariz. 26 Pac. Rep. 310, *Maricopa & Phœnix R. R. Co., v. Ariz. Ter.* 156 U. S. 347; *Torrey v. Baldwin*, 26 Pac. Rep. 908; *Gon-Shay-ee petitioner* 130 U. S. 343; *Ex parte Crow Dog* 109 U. S. 556-560; *Untied States v. Kagama*, 118 U. S. 375; *United States v. Pridgeon*, 153 U. S. 48.)

This doctrine was distinctly held by this court in *Keokuk v. Ulam*, 4 Okla. Rep. 5, 38 Pac. Rep. 1083.

The contention of plaintiffs upon this proposition would seem to be based upon reasonings and authorities which are not applicable. Their contention seems to be that these reservations are to be considered as exclusively under the jurisdiction of the United States, the same as lands purchased by the United States within the boundaries of states, and with the consent of said states for the purposes of forts, arsenals, magazines, navy yards, dock yards, etc. If this contention were correct, then it would be supported by all the authorities and would prevail, for I concede it to be uncontroverted that property situated wholly within boundaries exclusively within the jurisdiction of the United States, cannot be taxed by the state or territory within which it may be situated; but these reservations are not within boundaries exclusively within the jurisdiction of the United States, for the reason that congress in § 6 of the Organic Act of this territory delegated to the government of the territory legislative power extending to all rightful subjects of legislation not inconsistent with the constitution and laws of the United States within the exterior boundaries of the territory created by that act, which includes the reservation which is the *locus* of this controversy; that the jurisdiction conferred upon the territory is not exclusive; that congress has reserved to itself jurisdiction over the persons and lands of the Indians occupying the reservation, does not diminish or restrict the authority of the territory to legislate concerning the persons and property of citizens of the United States therein. It was the duty of the territorial legislature to apportion the burdens of government upon all property within the territory not withdrawn from its jurisdiction by the Organic Act or other laws of the United States or not otherwise exempted from such

burden by law.   The property of the plaintiff comprised a part of the mass of property within the territory which was receiving the protection of its laws and which might lawfully be and should justly be subjected to taxation.   And the right to subject such property to taxation, under the conditions and the situation in which plaintiff's property was, has not been denied by any court, but has been upheld in numerous instances.   (*Utah Northern Ry. v. Fisher*, 116 U. S. 28; *Torrey v. Baldwin*, 26 Pac. Rep. 908; *Phœnix & Maricopa R. R. Co. v. Ter. Ariz.* 26 Pac. Rep. 310; *Ferris v. Vennier*, 6 Dak.—42 N. W. Rep. 34; *Marico & Phœnix R. R. Co. v. Ariz. Ter.* 156 U. S. 347.)

In *Torrey v. Baldwin*, 26 Pac. Rep. 908, *supra*, the supreme court of Wyoming held that the treaty of July 3, 1868, with the Shoshones, pursuant to which their reservation was established, contained no reservation or exception whereby it should be excluded and excepted out of the territory within which it was situated, and that the reservation was included within the territory, and that cattle thereon belonging to a white person, in no wise connected with the Indians, were subject to taxation in the county within which the reservation lay.

In *Phoenix and Maricopa Railroad company v. Arizona Territory*, *supra*, the supreme court of Arizona held that in the absence of treaty or other express exclusions the different Indian reservations became a part of the territory where situate, and subject to territorial legislative jurisdiction, subject, however, to the powers of the general government to make regulations respecting the Indians, their property, etc., and that a railroad built across an Indian reservation in the territory is subject to taxation by the territory where there

are no treaty sti{.,}' 'tions or express exclusions against the jurisdiction of the territory; and this decision was, on appeal, affirmed by the supreme court of the United States in 156 U. S. 347, *supra*.

In *Utah Northern Railway v. Fisher*, 116 U. S. 31, Mr. Justice Field says:

"The authority of the territory may rightfully extend to all matters not interfering with that protection. (Protection of Indians and their property). It has therefore been held that process of its courts may run into an Indian reservation of this kind where the subject matter or controversy is otherwise within their cognizance. If the plaintiff lawfully constructed and now operates a railroad through the reservation, it is not perceived that any just rights of the Indians under the treaty can be impaired by taxing the road and property used in operating it."

A further contention of the plaintiffs is: That this reservation, under the statutes of the United States, has been leased by the Osage Nation or tribe for grazing purposes and that the taxation of cattle kept and grazed upon said reservation is a direct tax upon the right of the Indians to lease the same, and decreases to the extent of the tax the value of the Indian lands; that the act authorizing such taxation is in direct derogation of the property rights of the Indians upon such reservation and is therefore void. This proposition is without merit and certainly is unsupported by authority. The authority upon which plaintiffs rely to support this contention is the case of *Pollock v. the Farmers' Loan and Trust company*, 157 U. S. 429, known as the "Income Tax" case. Counsel in their brief quote from Mr. Chief Justice Fuller, on page 555 in the report of that case, as follows:

"The contention of the plaintiff is, first, that the law in qustion in imposing a tax upon the income of rents

of real estate imposes a tax upon the real estate itself; and in imposing a tax upon the interest or income of bonds or other personal property held for the purpose of income, or ordinarily yielding income, imposes a tax upon the personal estate itself; that such tax is a direct tax and void because imposed without regard to the rule of apportionment, and that by reason thereof the whole law is invalid."

It is true that that contention was sustained by a majority of a divided court in that case, but I am unable to perceive its application to the principles of the case at bar. The contention was sustained in that case, because it was held that a tax upon the income or rents of real estate imposed a tax upon the real estate itself; that it was therefore a direct tax, and that being such it was obnoxious to the provision of the constitution prohibiting the levy of direct taxes except by apportionment among the several states. It would not be seriously contended that that provision of the Federal constitution prescribed a rule operative upon any other legislative authority than the congress of the United States, or in the raising of revenue for the support of any government, other than the Federal government; but even if such contention should be made, the principle of the case cited is not broad enough to cover the proposition submitted by counsel for plaintiffs. The taxation we are considering was not assessed or levied upon the real estate or other property of the Indians occupying this reservation nor upon the income or rents of such Indians derived from such real estate or other property; this tax is not levied upon the rents which are paid to these Indians under their leases to the plaintiffs, but it is levied upon the property of the plaintiffs in which the Indians have no interest. The argument that taxation upon

property brought into this reservation for the purpose of grazing upon Indian lands is an additional servitude that decreases the salable value of the land, and that it operates in fixing the rental value of these lands to the same extent it would, if made a tax upon the land itself, is scarcely less remote than to say that the tariffs which these cattle owners have to pay to railroad corporations for transporting their cattle out of these reservations to market is an additional servitude, that decreases the rental value of the lands of the Indians; or, that the taxation of the personal property of a tenant is an added servitude on the freehold of the landlord. I do not think the act of the legislature providing for this taxation, in any manner, impairs the property rights of the Indians occupying this reservation.

Another contention of the plaintiffs is that this taxation is unconstitutional and void because it rests upon the attempt of the supreme court of the territory to fix taxing districts, which is a legislative function. The answer to this proposition is that the supreme court of the territory has not attempted to fix any taxing districts; that that court, under the powers expressly vested in it by the Organic Act of the territory, in 1894, attached this reservation and unroganized country to Kay county for judicial purposes, and not for the purposes of taxation; that the taxing districts in which these taxes were imposed and levied were created and fixed, not by the supreme court, but by the legislature, in the act of 1895; the language of the act being:

"That when any cattle are kept or grazed or any other personal property is situated in any unorganized country, district or reservation of this territory, that such property shall be subject to taxation in the organized

2—v.

county to which said country, district or reservation is attached for judicial purposes."

It was by this act that a taxing district was created and not by the order of the court.

Another objection which plaintiffs make against the legality of this tax is, that the act attempting to authorize it only applies to personal property; that no provision is made for the taxing of real estate in such reservation; that it is a discrimination in taxing different kinds of property, and therefore in conflict with the Organic Act.

This court will take judicial knowledge of the public treaties of the United States; and from such treaties the court has judicial knowledge that the title to all the lands within this Indian reservation is in the Indian tribe, or in the United States for the use of said Indian tribe. The power of taxation possessed by the territorial government not extending to the taxing of the property of the United States, or of the Indian wards of the United States, there is no taxable real estate in said reservation, and consequently the act does not discriminate as between different kinds of property subject to taxation, there not being different kinds of property subject to taxation in such reservation.

The most serious contention of the plaintiffs that confronts us in this matter is, that the act under which these taxes were assessed and levied is void for the reason that it attempts to tax property situated in these Indian reservations for the benefit of the counties to which they are attached for judicial purposes, the owners and holders of property on these Indian reservations, it being claimed, having no interest in the taxes gathered by said counties, no voice in their expenditure nor benefit

therefrom, said Indian reservations not being within the geographical boundaries of said counties; that the taxing of the owners of said property by such counties is taking the property of the persons holding said property on said reservation for the benefit of the residents of said county and is, therefore, taking private property for private uses.

It is argued that plaintiffs have no interest in the purposes for which these taxes are to be expended and will derive no benefit from their expenditure; that the moneys derived from this taxation under the county levy will all be expended within the organized county of Kay; that plaintiffs are non-residents of the territory, and that neither they or their property are within said county of Kay, and therefore cannot be benefitted by the expenditure of moneys apportioned and used for the salary. fund, contingent expense fund, sinking fund, court expense fund, county supplies fund, road and bridge fund, poor fund or county school fund of said county.

We have been cited to or been able to find but one authority directly in point upon the proposition as presented in this case.    In the case of *Ferris v. Vennier*, 42 N. W. Rep. 34, the supreme court of Dakota Territory, in a case similar to this in all particulars, save that the attached territory was not an Indian reservation but was an unorganized territory, held the levy for territorial purposes to be valid and those for county purposes to be invalid.    There are a number of authorities upon analogous cases, but such authorities are conflicting.    The greater number of authorities presented by counsel for plaintiffs in their brief upon this proposition relate to cases of special assessments for local improvement, such as the construction of highways, streets, pavements,

sewers, etc., where the benefits are peculiar to a limited district or locality, and this class of cases have always been held distinct in principle from that which we are considering and the right to impose such taxes' has always been held to be founded upon and to be governed by different principles from those embraced in public taxation for ordinary public or governmental purposes.

Bearing upon the case at bar, is the case of *Wells v. The City of Weston*, 22 Mo. 384, in which the court held that, "The legislature cannot authorize a municipal corporation to tax for its own local purposes land lying beyond the corporate limits."

In *Cheaney v. Hooser*, 9 Ben Monroe, 341, the court held that the extension of the limits of one town so as to include the adjacent lands of another town against or without the consent of the owners and subject the property and people within the added territory to the jurisdiction and taxing powers of the extended municipal government without the consent of the added population, is, in effect, taking private property for public use.

In *Sharpless v. Mayor of Philadelphia*, 21 Penn. State, 172, the court said: "By taxation, is meant a certain mode of raising revenue for a public purpose in which the community that pays it has an interest; but to make a tax law unconstitutional on this ground, it must be apparent at the first blush that the community taxed can have no possible interest in the purpose to which their money is to be applied. And this is more especially true if it be a local tax, and if the local authorities have themselves laid the tax in pursuance of an act of the assembly."

In a case in Tennessee, *Taylor, McBean & Co., v. William R. Chandler et al*, 9 Heiskall, 349, the court

said: "A state burden cannot be placed upon any territory less than the entire state, nor a county burden upon territory greater or smaller than the county."

In the case of *Washington Avenue*, 69 Penn. State, 361. the learned judge delivering the opinion says:

"I admit that the powers to tax is unbounded by any express limit in the constitution; that it may be exercised to the full extent of the public exigency. I concede that it differs from the power of eminent domain and has no thought of compensation by way of a return for that which is taken and applied to the public good, further than all derive benefit from the purpose to which it is applied."

In *Morford v. Unger*, 8 Iowa, 82, the court said:

"The extension of the limits of a city or town so as to include its actual enlargement as manifested by houses and population, is to be deemed a legitimate exercise of legislative power. An indefinite or unreasonable extension, so as to embrace lands and farms that are distant from the local government, does not rest upon the same authority. And although it may be a delicate, as well as a difficult duty for the judiciary to interpose, we have no doubt but that there are limits beyond which the legislative discretion cannot go."

*Kelley v. The City of Pittsburg*, 104 U. S. 658, was a case wherein the city of Pittsburg, under an act of the legislature, extended the city limits so as to include the plaintiff's farm, and assessed the same as other property in the city was assessed for street tax, school tax, etc. The court, in sustaining the validity of the extension, said:

"We cannot say, judicially, that Mr. Kelley received no benefit from the city organization. These streets, if they do not penetrate his farm, lead to it. The water-works will probably reach him some day and may be near enough him now to serve on some occasions. The schools may receive his children and in this regard he

can be in no worse condition than those living in the city having no children and who pay for the support of the schools. Every man in a county, a town, a city, a state, is deeply interested in the education of the children of the community, because his peace and quiet, his happiness and prosperity, are largely dependent upon the intelligence and moral training which it is the object of the public schools to supply to the children of his neighbors and associates, if he has none himself. The police government, the officers whose duty it is to punish and prevent crime, are paid out of the taxes. Has he no interest in their protection, because he lives farther from the court house and the police station than the others? Clearly, these are matters of detail within the legislative discretion and, therefore, of power in the law-making body within whose jurisdiction the parties live. This court cannot say in such cases, however great the hardships or unequal the burden, that the tax collected for such purposes, is taking the property of the tax-payers, without due process of law."

I might multiply citations from conflicting authorities like these, without finding any rule to guide or definitely determine where the line can be drawn which determines, in cases like this, the limit of legislative discretion.

Nearly, if not all, these cases arose to test the extent and limit of authority in subordinate agencies of the state, like municipal corporations, and not the discretion vested in the legislature of the state. No court has yet attempted to define, specifically, the benefits that a tax-payer must receive from government, in order to make valid the public taxes taken from him. True, in theory, taxation should be equal, not only in its burdens, but in its benefits, but this equality is never attained. No one questions the right of a commonwealth to tax the property of non-residents within its borders; yet, such non-residents do not stand upon a basis of equality in the benefits

of the government that imposes the tax. They may, or may not, receive particular benefits from its courts, its schools, the improvement of its public highways, or from any of the other purposes to which its revenues are appropriated. But such benefits are never a test of the liability of their property to taxation. The plaintiffs in this case might have their herds of cattle within the limits of Kay county and receive no greater benefit in the protection of the law than they do now; yet, they would not be heard to assert that such property should not be taxed for the various county purposes to which taxation is appropriated.

The counties, cities and towns of this territory are not independent or distinct governments from that of the territory. They are a part of that government; they are the instrumentalities and agencies through which the territorial government promotes the welfare of its inhabitants and through which the territory is better enabled to protect the lives and liberties of its inhabitants and the property that is within its borders, whether that of its own citizens or that of non-residents. The nearer these purposes are attained, the greater are the benefits to these plaintiffs, as well as to all others having property subject to the protection of its laws.

Laws similar to this, attaching unorganized remote territory to municipal townships in the state of Michigan, were for years maintained and enforced; and though the taxes gathered from the attached territory was appropriated and expended for the purposes of the township to which it was attached, I do not find that their validity was ever directly called into question. (*Roscommon v. Midland*, 39 Mich. 424; *Township of Comins v. Township of Harrisville*, 45 Mich. 442.)

In this last case the facts found by the court were that from the year 1869 until March, 1877, the county of Oscoda was attached to the county of Alcona for judicial and municipal purposes, and up to the last named date, the township of Harrisville, in said Alcona county, exercised municipal jurisdiction over the territory comprising the unorganized county of Oscoda. That, in 1877, the legislature organized the county of Oscoda into a township called by the act creating it, "The Township of Comins." In that year, and after the passage of said act, but before said township of Comins had been fully organized by the election of township officers, the township of Harrisville made an assessment roll embracing, with other territory, all the territory in the county of Oscoda, and the taxes thus assessed were collected by the officers of the township of Harrisville. In 1879, the township of Comins made a demand on the township board of the township of Harrisville for the payment to the township of Comins for the taxes thus collected in 1877 and suit was brought therefor. On that case, Marston, chief justice, says:

"The laws of this state relating to the assessment, levy and collection of taxes, does not regard certain designated territory as a township until the proper officers necessary to conduct its affairs have been elected. The officers of the new township, not having been elected until July, there was no such perfected organization as would enable that township to assess the township and school taxes for that year. Under such circumstances, in my opinion, the township of Harrisville had a right to levy and collect the taxes in question; but whether they did or not, the present action will not lie to recover the money so collected."

I can perceive no distinction, in principle, between that case and the case at bar; and, although the legality of

the assessment and collection of the taxes imposed was not directly involved in the case, both the circuit judge, trying the case, and the chief justice express no doubt as to their legality.

Not being able to point out the provision in the constitution, the Organic Act, in any statute, or general rule limiting the powers and discretion of the legislature, in imposing these taxes, from which I can say that they are unquestionably void, I am not disposed to arbitrarily invade the province of the legislative department to sit in review without other evidence than that which they possessed, and say that in this case they have abused the discretion vested in them to such a degree as to call for our interference. Under the general rules stated herein, we have no right to do this. This taxation may not be levied upon the basis of absolute equality. It may in a measure be unjust. It may impose upon the plaintiffs in this case a burden without equal compensation in benefits with others; but this, alone, will not warrant our interference.

Unquestionably the plaintiffs are benefitted in some degree by the expenditure of these taxes in Kay county. The proximity to their property of a well ordered community with courts and schools open to the plaintiffs if they wish to avail themselves of them, with good roads and bridges, with provision made for the care and maintenance of the poor and indigent, with these and the other elements of civilization, order and observance of law for which money obtained by taxation is expended, it is beyond dispute that plaintiffs have a greater security in their property rights than they would have without them. These are the benefits upon which the right of taxation is based, and gives to the legislature the

acknowledged authority to impose taxation. The authority being acknowledged, the reasonableness of or necessity for its exercise cannot be inquired into by the courts. Of such reasonableness or necessity the legislature and not the courts are to judge.

The validity of these taxes is further assailed on the ground that the act of the legislature authorizing them is obnoxious to the act of congress of July 30, 1886, 24 U. S. Stat. at Large, page 170, which provides as follows:

"That the legislature of the territories of the United States now or hereafter to be organized, shall not pass, local or special laws in any of the following enumerated cases, that is to say, for the assessment and collection of taxes, for territorial, county, township or road purposes."

It is insisted that the act in question is local and special. I cannot perceive how this contention can be sustained. The act has none of the elements of a local or special law. It does not operate upon an individual or a number of designated individuals, or upon particularly designated property. It operates upon any individual and upon any property that may come within its general provisions. Mr. Cooley, in his work on Constitutional Limitations, page 480, says:

"The authority that legislates for the state at large, must determine whether particular rules shall extend to the whole state and all its citizens or, on the other hand, to a subdivision of the state or a single class of its citizens only."

Again he says, page 481:

"If the laws be otherwise unobjectionable, all that can be required in these cases is that they be general in their application to the class or locality to which they apply; and they are then public in character and of their propriety and policy, the legislature must judge."

The constitutional requirement of equal protection of the laws does not make necessary the same local regulations, municipal powers, or judicial organization or jurisdiction. (*Missouri v. Lewis*, 101 U. S. 32; *Virginia v. Rives*, 100 U. S. 313; *Ex Parte Virginia*, 100 U. S. 339).

The prohibition of special legislation for the benefit of individuals does not preclude laws for the benefit of particular classes. As for example, mechanics and other laborers. (*Davis v. State*, 3 Lea, 376).

We think the case of *Daily Leader v. Cameron*, 3 Okla. 677, is decisive on this point. In that case this court says:

"A statute relating to persons or things as a class, is a general law. One relating to particular persons or things of a class is special. The number of persons upon whom the law shall have any direct effect may be very few by reason of the subject to which it relates, but it must operate equally and uniformly upon all brought within the relations and circumstances for which it provides. A statute, in order to avoid a conflict with the prohibition against such special legislation, must be general in its application to the class, and all of the class within like circumstances must come within its operation."

The statute in question in this case does not operate upon persons or things within a general class, but upon persons and things as a class. It operates upon all the unorganized counties, districts and reservations within the territory, and upon property generally, within such unorganized county, district or reservation, and operates uniformly upon such several counties, districts and reservations and upon the persons and things that may be brought therein, and is therefore in no sense local or special in its character.

It is further claimed that the act of 1895 violates the principle of uniformity in providing for an assessment of cattle kept and grazed upon these Indian reservations and unorganized territory at a different time from that provided for the assessment of personal property in the organized counties. That for this reason, it unjustly discriminates against the owner of such cattle and is therefore void.

I have already shown it to be a fundamental principle that the rules of taxation shall be uniform. It is of the very nature of a tax that it should be assessed according to some uniform rules, otherwise, it would be confiscation and not taxation. But this does not mean that the time and method of assessment shall be identical, but only that after the legislature has declared what classes of property shall be subject to taxation, the tax itself shall be levied upon such, or the owner thereof, according to a uniform rate of valuation. (*Nelson Lumber Co. v. Town of Loraine*, Sup. Ct. Wis. 22 Fed. Rep. 54).

Statutory provisions authorizing the assessment of different classes of property, at different dates, or of the same classes of property in different localities at different dates, are so common that their validity for this reason is scarcely ever called in question. The revenue law of this territory provides that real estate shall be valued for taxation on the first day of January, and that personal property in the counties shall be assessed on the first day of February of each year.

Counsel for plaintiffs, in their brief, ask: "What valid reason can be suggested why the property situated on these Indian reservations should be assessed and valued on one day and the property situated in the organized counties should be assessed and valued on another day?"

I think the answer to this question is found in the language of the supreme court of Wisconsin in *Nelson Lumber Company v. Town of Loraine*, *supra*, wherein it says:

"The purpose of the law would seem to be to bring about that substantial equality in taxation which the common law, as well the constitution, requires. The legislature was aware that the logs of non-residents, as well as resident owners, were liable to be floated out of the state in the month of April, or if not run out of the state, might become mixed with the logs of other persons in the different streams in such a manner as to render it quite impracticable to take any separate account of them in the month of May when the logs of resident owners are assessed. Very often they would be beyond the jurisdiction of the taxing officer of the town, and as the owner could not be reached and had no local agent in the state, they escape taxation entirely. The law, by providing that the situation, amount and value of the logs be taken in April at the place where piled or banked, seeks to put non-resident and resident owners on the same footing."

The legislature of this territory, when they enacted the law of 1895, undoubtedly took into consideration the peculiar conditions and situation of the property to be taxed in these reservations; that nearly all of the cattle that were kept on these reservations, were brought into the territory after the first of February, and would be removed before another listing of property for taxation; and unless a different date from that existing in the general law should be fixed for its assessment, such property would entirely escape taxation. The very principle of uniformity required that this distinction in dates of assessment should be made. It was not an injustice against the owners of the property, but it was to prevent injustice to the territory and to all its tax-paying citizens, by prohibiting this property from escaping its just share

of the burdens of taxation. I think this was a very proper exercise of the discretion of the legislature and that no discrimination exists such as is inhibited by the Organic Act of the territory and the act of congress of July 30, 1886.

The final proposition contained in plaintiff's brief, that relating to the action of the territorial board of equalization, in raising the aggregate valuations of property returned from the county of Kay for the year 1895, having been fully considered and determined by this court, at this term, in the case of *Wallace v. Bullen*, and held adversely to the contention of the plaintiff herein, fully disposes of this point.

For the reasons stated, upon the various points submitted herein, I am of the opinion that the legislature was vested with full authority to extend the revenue laws of the territory over the Indian reservations and other unorganized territory within this territory; that the act of 1895 was a proper exercise of such authority; that said act does not contravene any constitutional or other established rule of taxation; that I can find nothing in this record, showing such abuse of the discretionary power of the legislature as warrants our interference; that the assessment and taxation of plaintiffs' property under said act and in the manner shown was valid. I think that it follows, therefore, that the action of the court below in overruling defendants' demurrer to plaintiffs' petition, in so far as it related to the assessment and levy of said taxes for county purposes and perpetuating the injunction against the collection of such taxes, was erroneous; and the judgment of said court enjoining the collection of said taxes should be reversed, and this cause be dismissed.

Scott, J., and McAtee, J., concurring to the extent of holding that the tax levied for territorial and court expense funds are valid, but also hold that the balance of the levies are unauthorized, for the reason that the people on these reservations are not interested in such levies and receive no benefit from the expenditure of the moneys derived from such levies.

The judgment of the district court is affirmed.

Bierer, J., having presided in the court below, not sitting; Dale, C. J., dissents.