Nash, O. J.
 

 The lessor of the plaintiff claims the land in question, under a grant issued to him by the State, on the 25th September, 1849. The Legislature, at its session of 1848, passed a Resolution directing the Secretary of State to issue to Ailsey Medlin a grant for 640 acres of land, &c., to be located on any of the lands of this State now subject to entry by law. The 2nd branch of the Resolution restricted the loca' tion, so as to include any of the lands now belonging to the State, “ for which the State is bound for title, &c.” Ailsey Medlin assigned her right to the lessor of the plaintiff.
 

 The defendant claims title, under a sale made on 2nd of November, 1838, by certain commissioners appointed by the State. The land in. question was bid off by one Robeson, who assigned his bid to the defendant, who gave bond for the purchase money, and toot possession. In 1841, the defendant tendered the purchase money to the Treasurer of the State, who declined receiving it, as the bonds were in the hands of the agent of the State. In November, 1852, he paid the money to
 
 Mr. Siler,
 
 the State’s agent, who was duly authorised to receive it; and on 31st March, 1853, he obtained a grant from the State. The defendant had possession from the sale in 1838, up to the time of the trial.
 

 At June Term, 1852, of this Court, a cause came up for trial between this plaintiff and one John A. Powell, upon the title now presented by the plaintiff, for another tract of land
 
 *210
 
 similarly situated.
 
 Vide
 
 13 Ire. Rep. 312. The Court decided tliat the grant to the plaintiff’s lessor was void, having been issued for land lying in the Cherokee country, where the lands are protected from entry by the general law, and where no entry-taker’s office was, at that time, established. At the succeeding session of the Legislature, commencing in October, 1852, an Act was passed for the special purpose of establishing the legal right of the lessor of the plaintiff. It is as follows: “ Be it enacted, &c., That a grant, number 918, bearing date on 28th of December, 1819, issued to B. H. Stan-mire, assignee of Ailsey Medlin, for six hundred and forty acres of land, lying in Cherokee count}-, be, and the same is hereby validated and declared good and effectual to pass all the right of the State 'in and to the said land, any law to the contrary notwithstanding.” This Act took effect, by its provision, from and after its passage.
 

 The question presented for our consideration is, what effect does the Act of 1852 have upon the grant made to Stanmire in 1819
 
 %
 
 Before proceeding to answer this question, another point presents itself, which must be disposed of: can a grant founded on an entry made where vacant land is not subject to entry, be impeached collaterally, for defects in the entry, or for irregularities in any preliminary proceeding
 
 %
 
 The question is settled by the Court in
 
 Stanmire
 
 v. Powell,
 
 ut supra.
 
 They say, “where the law forbids the entry of vacant land in a particular tract of country, a grant for a part of such land is absolutely void, and that may be shown in ejectment. According to this decision, then, the grant of 1819 was void, and it can be shown collaterally.
 

 This brings up the main point in the case, which is as to the validity, and consequently the effect, of the Act of 1852. We believe it to be void, as being in violation of the Constitution of the United States. We are not unmindful of the delicacy of the question, and the just regard which ought to be observed towards a co-ordinate branch of the Government. To the General Assembly all legislative power is entrusted, and an act of theirs, passed with all the due formalities, should
 
 *211
 
 never, in a doubtful case, be pronounced by any Court to be unconstitutional. But when satisfied sucli is the fact, the Court would be unmindful of its high station, and of its solemn obligation, if it shrank from declaring the truth. In
 
 Fletcher
 
 v.
 
 Peck
 
 6 Cranch’s Rep. 128, Judge Marshall declares, “ The opposition between the Constitution and the law should be sucli, that the Judge feels a clear and strong conviction of their incompatibility with each other.” The power of Courts of justice to pronounce an Act of the Legislature unconstitutional, is now too firmly sanctioned by judicial decisions in every State of the Union, and in the Federal Courts of the United States, to be questioned. In the nervous language of Chancellor Kent, in the first volume of his Commentaries, p.
 
 44A, “
 
 To contend that the Courts of justice must obey the requisitions of an act of the Legislature, when it appears to them to have been passed in violation of the Constitution, would be to contend that the law is superior to the Constitution, and that the Judges had no right to look into it, and regard it as the paramount law of the land. It would be rendering the power of the agent superior to that of the principal.” If there were no power in the State to declare an Act of the Legislature unconstitutional, it was idle to impose restraints upon it, and every man would be driven to the necessity of putting his own construction upon the Act, or the Legislature, as in England, be considered omnipotent. But in North Carolina this duty is imperative. By the 12th section, of the Constitution, it is provided, that every person who shall be chosen a member of the Senate, or House of Commons, or appointed to any office, or place of trust, before taking his seat, or entering upon the execution of his office, shall take an oath to the Stateand all officers shall take an oath of office.” If then, as a Legislator or a Judge, he turn aside from his duty, or shrink from the performance of it, where a proper case presents itself, lie is unfaithful to his trust, and does an act injurious to those whose interests and rights he is bound to protect, and which is offensive to God. Besides the oath of fealty to the State, and the oath of office, every judicial offi
 
 *212
 
 cor takes an oath of fealty to the Constitution of the United States, and is as much bound to declare an Act of the Legislature, which violates its requisitions, unconstitutional, as when it violates that of the State. By "the 10th section of the 1st Article of the Constitution of the United States, it is provided, that
 
 no State shall pass a/ny Icm impawing the obligation of contraéis.
 
 The unappropriated land in this State belongs to the people of the State, in their collective capacity, and the Legislature, representing the sovereignty, have a right to transfer it to whom they please. Their right to grant it is not questioned; but they must be careful in"doing so, not to trespass on the vested rights of others. Let us see then if the Act of 1852 violates the article of the Constitution of the United States, above cited. The ■ Cherokee lands were not the subject of entry; the Legislature had adopted a different mode of disposing of them, from what was ordained for the other unappropriated lands. They had directed them to be sold by commissioners appointed for that purpose. At the sale by the commissioners, one Robeson purchased the premises in dispute, but transferred his right to the defendant who gave his bonds to the commissioners for the purchase money which he paid, to the agent of the State in November, 1852, and in March, 1853, procured his grant. The grant to the lessor of the plaintiff, under the decision of
 
 Stanmire
 
 v.
 
 Powell
 
 herein before referred to, was void and of no effect, and he acquired, under it, no title. In 1838, the defendant made his purchase. What was the contract between the State and the defendant? The former, through its agent, sold the premises to the defendant, and agreed to make him a title upon his paying the purchase money within a specified time. This he failed to do, and the State might have put an end to the contract, by ordering the lands to be re-sold, and returning to the defendant his bonds ; but this she did not do. She preferred to hold the defendant to his contract by sending the bonds to the agent,
 
 Mr. Siler,
 
 for collection, and' afterwards accepting the purchase money paid by the defendant to Mr. Siler, At the time, then, when the act of .1852 was passed,
 
 *213
 
 the defendant had a clear equitable right to the premises, of which the Legislature could not divest him, and which was turned into a legal one by his grant. A grant made by the Legislature is a contract within the meaning of the clause of the Constitution of the United States: no State shall pass any law violating contracts whether they be executory or executed,
 
 Fletcher v.
 
 Peck,
 
 ubi
 
 supra, p. 137.
 
 “
 
 A law,” says Judge Marshall, “annidling conveyances between individuals, and declaring that the grantors should stand seized of their former estates, notwithstanding those grants, would be as repugnant to the Constitution, as a law discharging the vendors of property, from the obligation of executing their contracts by conveyances.” Neither can the Legislature discharge itself from its obligation to perform its contracts. If the Act of 1852 was intended to give life to .the void grant, under which the plaintiff claims the premises, by giving a construction to it, the^act was a judicial one, which it is not in the power of the Legislature to pronounce. If it is to be considered purely a Legislative grant to the lessor of the plaintiff, then it violates the contract it had made with the defendant Taylor, and is void. If void, it cannot bind the Courts, for it would be to overthrow in fact what was established in theory, and make that operate as law, which is not law. It may, indeed, be well questioned if the Act of 1852 is not void by force of the common law. It attempts to transfer the property of one, without his consent, to another. In Dr. Bonham’s case, 8 Coke, 118, Lord Coke declares that, “ the common law doth control acts of Parliament, and adjudges them void when against common right and reason.” This opinion was recognised by Chief Justice IIobart in
 
 Day
 
 v. Savage, Hob. Rep. 87, and by Chief Justice Holt in
 
 City of London
 
 v.
 
 Wood,
 
 12 Mod. Rep. 687. Chancellor Kent admires the intrepidity and powerful sense of justice evinced by Lord Coke in avowing such a sentiment. It will not do to say that the State cannot be sued by one of her ovni citizens. True, she cannot, but does that absolve her from the obligations of justice, and truth, and honor? And to reñise know
 
 *214
 
 ingly to execute her contracts, or to endeavor to put it out of her power to comply with them, is what has not yet fallen upon North Carolina; and
 
 longo, longo intervallo,
 
 may the time be before she shall refuse justice to the lmihblest of her citizens because she cannot be
 
 compelled
 
 to grant it.
 

 It does not become us to look into the motives of the Legislature in passing the Act of 1852. Its .effect and operation we are at liberty to declare. Believing that the Act violates that article of the Constitution of the United States to which we have referred, our duty is to pronounce it void.
 

 Pee Curiam.
 

 Judgment reversed, and a
 
 venire de novo
 
 awarded.