SOUTHERN RAILWAY COMPANY v. CHEROKEE COUNTY.

(Filed 3 January, 1919.)

1. Constitutional Law—Statutes—Courts.

In construing an act of the Legislature with regard to ascertaining whether or not it is in conformity with the State Constitution, the purpose of the courts is to sustain its validity if it can reasonably be done; but where there is an irreconcilable conflict, it is the duty of the Court, under its oath, to sustain the Constitution, not the will of the legislators, who are but agents of the people.

2. **Taxation— Constitutional Law— Statutes— Limitation— General Laws—
Special Laws.**

Under the provisions of our Constitution, act 5, sec. 1, it is commanded
that the poll tax shall always be equal to that on $300 valuation on prop-
erty, and that it shall not exceed $2 upon the poll, and a statute which
authorizes any county to levy a tax in excess of this constitutional limita-
tion for general expenses, though called a "special" tax in the act, is
unconstitutional and invalid.

3. **Same—Schools.**

Section 9, ch. 33, Laws of 1913, being a part of an act "to provide for a
six-months school term in every public school district of the State," but
authorizing a tax in every county in the State for ordinary expenses, with-
out enumerating them, is coextensive with the legislative power, as to the
territory, people or property to be taxed, and the purpose is general, and
not a special one, within the meaning of act 5, sec. 1 thereof.

4. **Constitutional Law—Taxation—Statutes—Ratification.**

Chapter 88, Laws of 1913, permitting the levy of a tax for the years
1913 and 1914, does not purport to authorize a levy of a tax in 1915 for
school purposes in excess of the constitutional equation between the poll
and the property tax (act 5, sec. 1), or a special levy for school purposes
(act 5, sec. 6), and if otherwise, it would fall within the same condemna-
tion as sec. 9, ch. 33, Laws of 1913, and ch. 109, Laws of 1917, cannot
validate the levy of 1915 by ratifying ch. 33, Laws of 1913, because the
Legislature had not the original authority to enact it.

5. **Taxation—Payment—Protest—Statutes—Actions—Demand.**

Where a taxpayer has paid his taxes authorized by an unconstitutional
statute, under protest, and has complied with the provisions of Revisal,
sec. 2855, which regulates and controls actions to recover illegal taxes
paid under protest, it is unnecessary to the maintenance of his action to
recover them that he follow the provisions of sec. 1384, requiring that he
present his claim and make his demand, etc.

WALKER, J., concurs in result; CLARK, C. J., dissenting.

ACTION to recover the amount of certain taxes paid by the plaintiff,
under protest, upon the ground that they were illegally levied and col-
lected.

There was a judgment in favor of the plaintiff, and the defendant
excepted and appealed.

*A. B. Andrews and Dillard & Hill for plaintiff.*
*J. S. Manning, Frank Nash, and J. D. Mallonee for defendant.*

ALLEN, J. In the year 1915 the county of Cherokee levied and col-
lected a tax of 2⅔ cents in excess of 66⅔ cents on property of the
value of $100. The plaintiff paid this tax on its property under protest,
and this action is brought to recover the amount so paid. The tax was
not for schools, but was levied "for the purpose of taking up a note in

bank made by the predecessor board and other current expenses" under the authority of ch. 33, sec. 9, Laws of 1913, which is as follows:

"SEC. 9. That the board of commissioners of any county in North Carolina be and they are hereby authorized and empowered to levy a special tax in excess of the constitutional limitation, not exceeding five (5) cents on the one hundred dollars ($100) valuation of all property listed for taxation in their respective counties, to provide for any deficiency in the necessary expenses and revenue of said respective counties which may be caused by the provisions of this act."

These facts are found by his Honor and are not controverted by the defendant, and they necessitate an inquiry into the constitutionality of the act of the General Assembly.

The text-writers and the decided cases agree that it is not only within the power, but that it is the duty, of the courts in proper cases to declare an act of the Legislature unconstitutional, and this obligation arises from the duty imposed upon the courts to declare what the law is.

The Constitution is the supreme law. It is ordained and established by the people, and all judges are sworn to support it. When the constitutionality of an act of the General Assembly is questioned, the courts place the act by the side of the Constitution, with the purpose and the desire to uphold it if it can be reasonably done, but under the obligation, if there is an irreconcilable conflict, to sustain the will of the people as expressed in the Constitution, and not the will of the legislators, who are but agents of the people.

The principle is well stated in 6 Ruling Case Law, 72, that "Since the Constitution is intended for the observance of the judiciary as well as the other departments of government, and the judges are sworn to support its provisions, the courts are not at liberty to overlook or disregard its commands, and, therefore, when it is clear that a statute transgresses the authority vested in the Legislature by the Constitution it is the duty of the courts to declare the act unconstitutional, and from this duty they cannot shrink without violating their oaths of office. The duty, therefore, to declare the law unconstitutional in a proper case cannot be declined, and must be performed in accordance with the deliberate judgment of the tribunal in which the validity of the enactment is directly drawn in question."

The first exercise of this power in this State was in 1787, in *Bayard v. Singleton,* 1 N. C., 42, and one of the latest was in 1912, in *Comrs. v. Webb,* 160 N. C., 594, in which an act was held unconstitutional by the unanimous opinion of the Court, written by the present *Chief Justice.*

In *Sutton v. Phillips,* 116 N. C., 504, in an opinion written by *Chief Justice Clark,* the Court says: "While the courts have the power, and it is their duty in proper cases, to declare an act of the Legislature un-

constitutional, it is a well-recognized principle that the courts will not declare that this coördinate branch of the government has exceeded the powers vested in it unless it is plainly and clearly the case"; and this language was approved and affirmed in the case of *In re Watson,* 157 N. C., 349.

In 1913 an act of the General Assembly was declared to be unconstitutional in *Asbury v. Albemarle,* 162 N. C., 248, and in *Sewerage Co. v. Monroe,* 162 N. C., 275, and between these cases, running from the first volume of our Reports to the 162d, covering a period of one hundred and twenty-five years, there could be cited fifty or more cases in which acts of the General Assembly have been declared unconstitutional, and we find no judicial opinion to the contrary.

De Tocqueville, the eminent French philosopher, speaking of our Constitution and of the powers of the courts, says in Democracy in America, p. 98 *et seq.:* "An American Constitution is not supposed to be immutable, as in France, nor is it susceptible of modification by the ordinary powers of society, as in England. It constitutes a detached whole, which, as it represents the determination of the whole people, is no less binding on the legislator than on the private citizen, but which may be altered by the will of the people in predetermined cases, according to established rules. In America the Constitution may, therefore, vary; but as long as it exists it is the origin of all authority and the sole vehicle of the predominating force. . . . In the United States the Constitution governs the legislator as much as the private citizen; as it is the first of laws it cannot be modified by a law, and it is therefore just that the tribunals should obey the Constitution in preference to any law. This condition is essential to the power of the judicature, for to select that legal obligation by which he is most strictly bound is the natural right of every magistrate. . . . I am inclined to believe this practice of the American courts to be at once the most favorable to liberty as well as to public order."

We must then examine the sections of the Constitution relating to taxation for the purpose of seeing if the General Assembly has transcended the limitations on its powers to be found in that instrument. Art. V, sec. 1, is as follows: "The General Assembly shall levy a capitation tax on every male inhabitant of the State over twenty-one and under fifty years of age, which shall be equal on each to the tax on property valued at three hundred dollars in cash. The commissioners of the several counties may exempt from capitation tax in special cases, on account of poverty and infirmity, and the State and county capitation tax combined shall never exceed two dollars on the head."

This section establishes the equation between property and the poll

and limits the power to levy State and county taxes on property to $2 on property of the value of $300, or 66⅔ on $100.

"It is too plain to admit of argument that the intent of this section was to establish an invariable proportion between the poll tax and the property tax, and that as the former is limited to $2 on the poll, so is the latter to $2 on the $300 valuation of property." This was said by *Rodman, J.,* a member of the convention which framed the Constitution, in *R. R. v. Holden,* 63 N. C., 427.

This section commands two things:

"1. That the poll tax·shall always be equal to that on $300 valuation of property. This has been called the equation of taxation.

"2. That the State and county poll tax shall not exceed $2. This fixes the limit of taxation on polls, and consequently on property.

"These two directions are equally definite and positive; they are in no wise inconsistent with each other; it is impossible that one has any more favor or sanctity than the other merely because it comes earlier or later in the sentence; they must be equally binding on the Legislature." *Rodman, J.,* in *Winslow v. Weith,* 66 N. C., 432.

"It is well settled that, for the ordinary expenses of government, both State and county, the first section of Article V of the Constitution places the limit of taxation and preserves the equation between the capitation and the property tax—the capitation tax never ·to exceed $2 and the tax upon property valued at $300 to be confined within the same limit." *Board of Education v. Comrs.,* 111 N. C., 580.

"The taxes which the commissioners are empowered to levy have their limitations in the Constitution, and these cannot be exceeded 'except for a special purpose and with the special approval of the General Assembly.' Const., Art. V, secs. 1 and 6.· The construction of these clauses has been fixed by a series of decisions, from one of which (*French v. Comrs.,* 74 N. C., 692) we extract the emphatic declaration of *Bynum, J.:* 'It admits of no dispute now that taxation for State and county purposes combined cannot exceed the constitutional limitation for their necessary expenses and *new debts.*' *Trull v. Comrs.,* 72 N. C., 388; *Clifton v. Wynne,* 80 N. C., 145; *Mauney v. Comrs., supra.*" *Cromartie v. Comrs.,* 87 N. C., 139.

These authorities establish beyond controversy that the tax is illegal, under section 1 of Article V, because it exceeds the limitation on State and county taxes, and the defendant, if it has any standing in court, must rely on section 6 of Article V, which permits the county commissioners to exceed the constitutional limitation in section 1 "for a special purpose and with the special approval of the General Assembly."

These two sections must be considered and read together with the purpose in view of giving effect to both, and a construction must be

avoided which will make one destructive of the other, which would be the result if the commissioners could exceed the constitutional limitation under authority of section 6 for general purposes, and under general laws, because under such a construction the General Assembly could levy a State tax up to the limitation under section 1, and then pass a general law under section 6 allowing the counties to levy the same tax for county expenses.

.The first section "was inserted in the Constitution of 1868 as a guarantee to the property holders of the State that they would not be oppressed by inordinate taxes laid by representatives elected by the newly enfranchised blacks, who had small property to be taxed and whose representatives might otherwise be tempted to levy excessive taxes on property (*Rodman, J.,* 63 N. C., at p. 427), and for nearly thirty years since this breakwater was put into the Constitution it has never been lost sight of" (*Clark, J.,* in *Russell v. Ayer,* 120 N. C., 191), and section 6 for the purpose of providing for an emergency that could not be reasonably anticipated, and as a safeguard against increasing taxation hastily and without due consideration, and to furnish publicity, a special act stating the special purpose is required.

Does section 9 of chapter 33 of the Laws of 1913 come within the classification of special laws, and is a tax for current expenses of a county a special purpose? It is a part of an act "to provide for a six-months school term in every public school district of the State," and the section authorizes a tax in every county in the State for ordinary expenses, without enumerating them, thus making it coextensive with legislative power, so far as territory or the people or property to be affected are concerned, and the purpose is general.

"A statute which relates to persons or things as a class is a general law, while a statute which relates to particular persons or things as a class is a special one. *Ewing v. Hoblitzelle,* 85 Mo., 64, 78; *Schmalz v. Wooley,* 56 N. J. Eq., 649; *In re New York Elevated R. Co.* (N. Y.), 3 Abb. N. C., 401, 417, 422; *Gay v. Thomas,* 5 Okla., 1; *Clark v. Finley,* 93 Tex., 171; *Hamman v. Central Coal and Coke Co.,* 156 Mo., 232; *State ex rel. Harris v. Herrmann,* 75 Mo., 340, 346; *Lynch v. Murphy,* 119 Mo., 163; *Sawyer v. Dooley,* 21 Nev., 390; *Herbert v. Baltimore County Comrs.,* 97 Md., 639.

"Special laws are those made for individual cases, or for less than a class requiring laws to its peculiar conditions and circumstances. *Vermont Loan and Trust Co. v. Whithed,* 2 N. D., 82; *Guthrie Daily Leader v. Cameron,* 3 Okla., 677; *Maxwell v. Tillamook County,* 20 Ore., 495 (quoting *Healey v. Dudley* (N. Y.), 5 Lans., 115; Suth. St. Const., par. 127); *Groves v. Grant County Court,* 42 W. Va., 587 (citing 1 Bl. Com., 196).

"A special statute is one operating upon one, or a portion of a class, instead of upon all of a class. *S. v. Irwin,* 5 Nev., 111, 120.

" 'Local or special legislation,' according to the well-known meaning of the words, applies exclusively to special or particular places, or special and particular persons, and is distinguished from a statute intended to be general in its operation and that relating to classes of persons or subjects. *Stone v. Wilson* (Ky.), 39 S. W., 49, 50.

" 'Private or special statutes,' says Sedgwick in his work on Statutory and Constitutional Law, 'relate to certain individuals or particular classes of men.' In Smith on Constitutional Construction it is said: 'The distinction between public and private statutes is this: A general or public act is a universal rule that regards the whole community, but special or private acts are rather exceptions than rules, being those which operate upon private persons and concerns.' Page 917, par. 802; *People v. Wright,* 70 Ill., 388, 298.

"Whether or not an act of the Legislature is special or general, within a constitutional provision, is not to be determined by the form of the act, but by what in the ordinary course of things must necessarily be its operation and effect. If this operation and effect must necessarily be special, the act is special, whatever may be its form; but if, on the other hand, the act has room within its terms to operate on all of a class, present and prospective, and not merely on one particular thing, or on a particular class of things, existing at the time of its passage, the act is general. *City of Topeka v. Gillett,* 32 Kan., 431; *S. v. Hunter,* 38 Kan., 578." Words and Phrases, V. 7, 6577 *et seq.*

There are two cases in our own Reports which seem to be decisive of the whole question. The first is *Williams v. Comrs.,* 119 N. C., 520, approved in *Herring v. Dixon,* 122 N. C., 423, in which it was held that a statute authorizing a special county tax for the purpose of maintaining public ferries, building roads, and meeting other *current expenses* was not for a "special purpose" within the meaning of section 6 of Article V of the Constitution, and that a tax levied thereunder in excess of the constitutional limitation of section 1 was void; and the second, *Bennett v. Comrs.,* 173 N. C., 629, which says that a statute "conferring on county commissioners the power to borrow money for the necessary expenses of the county and provide for its payment" "neither is, nor does it purport to be, a 'special act and for a special purpose' within the meaning of the constitutional provision."

We are, therefore, of opinion the tax has not been levied under a special act or for a special purpose, and this seems to have been the opinion of the General Assembly of 1917 and of those in charge of the educational interests of the State, as otherwise there was no necessity for submitting to a vote the constitutional amendment providing for a

six-months school term. Why take the trouble to amend the Constitution, and why run the risk of a vote of disapproval, if it was within the power of the General Assembly to increase the State tax for schools and to authorize the counties to levy taxes in excess of the constitutional limitation for ordinary and necessary expenses; and this is what the act of 1913 purports to do.

Another act of 1913 (chapter 88) has been referred to in the argument, but it only permits the levy of a tax for the years 1913 and 1914, and the time for acting thereunder had expired when the tax of 1915, which is in controversy in this action, was levied; nor did the commissioners of Cherokee purport to act under chapter 88. The amendatory act of 1917 (chapter 109) is also ineffective to validate the tax levy of 1915. In the first section it amends chapter 88, Laws of 1913, by making the tax for current expenses of the county in excess of the constitutional limitation an annual tax, and would fall under the same condemnation as section 9 of chapter 33, Laws of 1913, and in the second section it undertakes to ratify levies for 1915 and 1916, but the General Assembly cannot ratify an act which it could not authorize originally.

The defendant further contends that this action cannot be maintained, although the tax is illegal, because of the failure to present the claim and make demand as required by section 1384 of the Revisal, but the plaintiff has followed and complied with section 2855 of the Revisal, which regulates and controls actions brought to recover illegal taxes paid under protest.

Affirmed.

WALKER, J., concurring in result: I agree fully with the Court in its opinion, as delivered by *Justice Allen,* that the tax provided for in the statute is for a general and not a special purpose, and therefore is not authorized by the Constitution under Art. V, secs. 1 and 6. But I do not agree that section 6 permits a tax exceeding the constitutional limit as fixed by section 1. It was intended to establish the proportion between State and county taxation, providing, and providing only, that the latter shall not exceed the double of the former except for a special purpose and with special approval of the General Assembly. There is nothing said about exceeding the limit of taxation, and no distinction is made in section 1 or section 6 between ordinary and extraordinary expenses. The language is: "The General Assembly shall levy a capitation tax on every male inhabitant of the State over twenty-one and under fifty years of age, which shall be equal on each to the tax on property valued at three hundred dollars in cash (clause as to exemptions omitted), and the State and county capitation tax combined shall. *never* exceed two dollars on the head." (*Italics ours.*)

I will not repeat here what was said by me in *Collie v. Comrs.,* 145 N. C., at p. 177, and later in *Moose v. Comrs.,* 172 N. C., 451. We are not permitted to construe the Constitution by a consideration of subsequent conditions and circumstances, and if the growth and development of the State, since it was adopted, has made necessary a higher limit, the remedy is not in interpretation, but by amendment as provided in the instrument itself. For some time after its adoption, there was plenty of room within the limit it prescribed for the counties to more than double the State tax; but however this may have been, we must ascertain the meaning of the Constitution by considering only its language. These principles are so very elementary as not to require further discussion or the citation of authority. I considered this question fully in the cases cited above and will not go over the argument again.

I agree with the statement in the opinion that this Court has the power to declare a statute invalid as being in conflict with the Constitution. To be more accurate, it is not that the statute conflicts with the Constitution, but that the Legislature has exceeded its power as fixed by it, and to the extent that it has done so the legislation is unwarranted, and therefore invalid. Whether in any particular case the Legislature was without authority under the Constitution to act is so plainly and palpably a question of law that it would be more than idle or vain to demonstrate it. It is really not now an arguable question. Standard text-writers, commentators and publicists, and also the largest majority of the courts and jurists, agree that this question has been set at rest by a long line of cases in the Federal and State jurisdictions, which have virtually closed the door to all discussion. If any Court in the Union has been thoroughly and irrevocably committed to this doctrine, it is this Court. If it was not the first, it was certainly among the first to announce it as a clear and unquestioned principle in constitutional law. The Legislature has no more right to act beyond the scope of its power, as limited by the Constitution, than this Court has to exceed the jurisdiction allotted to it in the distribution of governmental powers made by that instrument to the three coördinate departments—that is, legislative, executive, and judicial—and when it attempts to do so, all that it does beyond that limit is just as void as would be a judgment of this or any other Court rendered in excess of its jurisdiction.

The legislative power not granted in the Constitution, expressly or by clear implication, was retained by the people, to be exercised or delegated as they may see fit. The people did not exhaust all of their sovereign power when they framed the Constitution, but there was a large residue still retained by them. The Legislature is not, therefore, a sovereign body with plenary powers, but within the proper and prescribed limit, as set by the Constitution, it is entitled to have—and so far as this Court is concerned will have—perfect freedom of action.

Among the powers denied to it is the one now being considered; that is, the power to levy taxes beyond the limit fixed by the Constitution in Article V, sections 1 and 6.

It is strangely claimed by some that it has unlimited right to decide for itself, and finally, whether it has a given power, and if this be so, it would manifestly result that the Constitution, instead of being a charter of fundamental principles and policy, would have no more binding force and effect than a statute, as it could be repealed or set at naught, according as the Legislature might will, meaning one thing today and another thing at some day in the future, or nothing at all, as partisan whim or caprice might determine. Such a doctrine is wholly inadmissible and is entirely at variance with every proper conception and notion of constitutional government. It has been so held by nearly all, if not all, of the American courts. As early as 1780 the Supreme Court of New Jersey, in *Holmes v. Walton,* Amer. His. (Vol. 4), 456, laid down this doctrine, and that case was followed in New York by *Rutgers v. Waddington,* Fiske Cr. Period, Am. His., p. 127, decided in 1784, and in this State by *Bayard v. Singleton,* 1 N. C., 42, cited in the opinion of the Court.

The same Constitution that created the Legislature and gave it the power to legislate also created this Court, and expressly prescribed its jurisdiction, giving it final, appellate jurisdiction of matters of law and legal inference. Art. IV, sec. 8. And this brings us to consider the conclusive argument of the illustrious *Chief Justice Marshall* in *Marbury v. Madison,* 1 Craud (U. S.), 137, who said, when speaking for the Court: "It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each. So if a law be in opposition to the Constitution—if both the law and the Constitution apply to a particular case, so that the courts must either decide that case conformably to the law, disregarding the Constitution, or conformably to the Constitution, disregarding the law—the courts must determine which of these conflicting rules governs the case. This is the very essence of judicial duty. If, then, the courts are to regard the Constitution, and the Constitution is superior to any ordinary act of the Legislature, the Constitution, and not such ordinary act, must govern the case to which they both apply." That case has been approved and its doctrine fully accepted and followed by practically all the courts and text-writers.

This comports with the language of our Constitution, which requires us to decide upon "all questions of law or legal inference." We must needs first determine what the law is before we can pass upon it or apply it to individual cases or controversies, and in discharging this

important duty, or in exercising our jurisdiction, we must necessarily decide, when the validity of a statute is challenged or brought into con-- troversy, whether it is valid or not, just as we would do if a judgment of a court of this or any other State is attacked for want of the neces- sary power or jurisdiction to render it; we must say whether it is valid. or not.

Let me quote the impressive words of another great constitutional lawyer, *Judge Cooley,* in his standard work on Constitutional Limita- tions. He said at p. 228: "The courts sit not to review or revise the legislative action, but to enforce the legislative will; and it is only where they find that the Legislature has failed to keep within the constitutional limits that they are at liberty to disregard its action; and in doing so they only do what every private citizen may do in respect to the man- dates when the judges assume to act and to render judgment or decrees without jurisdiction. In exercising this high authority the judges claim no judicial supremacy; *they are only the administrators of the public will.* If an act of the Legislature is held void, it is not because the judges have any control over the legislative power, but because the act is forbidden by the Constitution, and because the will of the people, which is therein declared, is paramount to that of their representatives expressed in any law."

To the same effect is the Federalist (Dawson's Ed.), No. 78: "There is no position which depends on clearer principles than that every act of a delegated authority contrary to the tenor or commission under which it is exercised is void. No legislative act, therefore, contrary to the Constitution can be valid. To deny this would be to affirm that the deputy is greater than the principal; that the servant is above his mas- ter; that the representatives of the people are superior to the people themselves; that mere men acting by virtue of powers may do not only what their powers do not authorize, but what they forbid." And *Judge Dicey* observes that it is now considered not only the right but the duty of every judge in the United States to treat as void any enactment which violates the Constitution, and *Judge Cooley* adds that it is now gener- ally agreed that the courts cannot properly decline to overrule the acts of the Legislature when it has exceeded the authority set by the Consti- tution to its limits. Dicey's Law of the Constitution (2d Ed.), 125.

As early as 1795, *Justice Patterson* of the United States Supreme Court said: "I take it to be a clear position that if a legislative act impugns a constitutional principle, the former must give way and be rejected on the score of repugnance. I hold it to be a position equally clear and sound that in such a case it will be the duty of the Court to adhere to the Constitution and to declare the act null and void." *Van- horne's Lessee v. Dorrance,* 2 Dall. (U. S.), 304. The whole subject is

treated very fully and very clearly in Modern Am. Law (Vol. XI), pp. 64 to 80.

It hardly need be said that no Court would declare a statute void unless the violation of the Constitution is so manifest as to leave no room for reasonable doubt. It need only be added that this Court, in numerous decisions, has exercised this power without dispute or cavil, and for many years since *Bayard v. Singleton* was decided. The following are examples: *Jones v. Crittenden,* 4 N. C., 55 (suspension of payments of debts); *Trustees of University v. Foy,* 5 N. C., 59 (resuming escheated lands); *Allen v. Peden,* 4 N. C., 442 (emancipating slaves without owner's consent); *Robinson v. Barfield,* 6 N. C., 391 (validating improperly executed deeds); *Bank of the State v. Bank of Cape Fear,* 35 N. C., 75 (impairing obligation of contract as to payment of bank notes); *S. v. Moss,* 47 N. C., 66 (jurisdiction of intendant of police of Charlotte); *Stanmire v. Taylor,* 48 N. C., 207 (grant of land already sold by State); *Barnes v. Barnes,* 53 N. C., 366 (stay law); *King v. Comrs. of Lincoln,* 65 N. C., 603 (tax collector case); *Wesson v. Johnson,* 66 N. C., 189 (common-law right of dower as to prior marriages); *Galloway v. Chatham R. R. Co.,* 63 N. C., 147 (State subscription to railroad company stock); *People v. Bledsoe,* 68 N. C., 457 (government of penitentiary); *Bailey v. Caldwell,* 68 N. C., 472 (compensation of C. C. P. commissioners); *People v. McGowan,* 68 N. C., 520 (election of Keeper of Capitol); *Latham v. Whitehurst,* 69 N. C., 33 (requiring mortgage debts to be reduced to judgment). There are as many more cases, since decided, which expressly acknowledge this power without a dissenting voice, and some of comparatively recent date.

It also must be remembered that every case in which the question of the validity of a statute is considered by the Court, although the decision be in favor of it, is a concession of the principle that the Court may pass upon its constitutionality and declare it void in a proper case, for why discuss the question if the Court cannot decide upon it? See the Constitution of North Carolina annotated by Connor and Cheshire, p. 543, for cases.

In *Purnell v. Page,* 133 N. C., 125, it was held that the income of a Federal judge could not be taxed by the State, and *vice versa,* and that any attempt by the Legislature to impose such a tax would be futile, and when properly questioned would be declared void, and this position was conclusively maintained in a strong and able argument by the present *Chief Justice,* who referred to the opinions of Attorney-General Batchelor, adopted by the Supreme Court, composed then of *Nash, Chief Justice,* and *Pearson* and *Battle, Judges* (4 N. C., 555), and that of Attorney-General Gilmer, 131 N. C., 692, approved by the Court as denying the

power of the Legislature to tax the salaries of the judges, which would plainly be a diminution of them, forbidden by the Constitution.

It may be taken, therefore, as finally settled by this Court that the power to declare a statute invalid, as being unauthorized by the Constitution, exists, and that while the consideration of the question should be approached with great caution and the question itself examined with the most careful scrutiny, it will be pronounced invalid if it so clearly and obviously appears to be so that all reasonable doubt has been excluded. The Constitution is of paramount authority, and prescribes the rule to all departments of the government, to this as well as to the others, and each of them owes to it submission and obedience, and we should most willingly and cheerfully acknowledge its supremacy and render our allegiance to it accordingly as the highest law. Any other course, instead of perpetuating the blessings of the government, so happily designed by our forefathers and transmitted to us, would eventually lead to confusion, disorder and anarchy. Our oath, so carefully and impressively framed, binds us most solemnly to the performance of this higher duty to preserve and maintain the fundamental law.

CLARK, C. J., dissenting: In August, 1915, the Board of Commissioners of Cherokee regularly levied 19 cents for county general tax and (under the authority of chapter 33, Laws 1913) a special tax of 2⅔ cents on $100 valuation of all property listed in Cherokee County. This special tax was levied as authorized by the General Assembly by section 9, chapter 33, Laws 1913, and chapter 88, Laws 1913, and the amendments thereto, for the purpose of providing for the deficiency caused in the revenue of said county in 1914 by said chapter 33 and by section 3, chapter 201, Laws 1913, which rendered it necessary in order to take care of certain outstanding indebtedness of Cherokee which could not be met for the year 1914 out of the revenue raised by the 19-cent levy for said year.

The property of the plaintiff, the Southern Railway Company, in Cherokee County, consisting of some twenty-four miles of railroad track and its proportion of the equipment, engine, cars and investments and its franchise, was assessed for taxation at more than a million dollars, and the 2⅔ cent special tax levied against this property in aid of education (as against all other property holders in the county) amounted to $275.56. This action is brought to recover said sum which had been paid into the county treasury by the railroad company.

Said section 9, chapter 33, Laws 1913, provides: "The board of commissioners of any county in North Carolina be and they are hereby authorized and empowered to levy a special tax in excess of the constitutional limitation, not exceeding five (5) cents on the one hundred dol-

lars ($100) valuation of all property listed for taxation in their respect-
ive counties, to provide for any deficiency in the necessary expenses and
revenue of said respective counties which may be caused by the pro-
visions of this act."

Said act was passed to increase the revenue of the State for school
purposes so as to provide for a six-months school term. Said act de-
scribes the levy authorized to be "a special tax," and the "special pur-
pose" for which it is authorized is recited to be "to provide for any de-
ficiency in the necessary expenses and revenue" of any county which
might be caused by raising the State levy to 47⅔ cents. Not a dollar
of this $275 was spent for schools, but was spent exclusively for other
necessary county expenses.

In Connor & Cheshire on Cons., 281, it is said: "The equation and
limitation placed upon taxation by Art. V, sec. 1, has no application to
taxes levied hereunder for a special purpose, when levied with the special
approval of the General Assembly," citing *Board of Education v. Comrs.,*
137 N. C., 310; *Jones v. Comrs.,* 107 N. C., 248; *Street v. Comrs.,* 70
N. C., 644; *R. R. v. Holden,* 63 N. C., 410; *R. R. v. Comrs.,* 148 N. C.,
220. This has always been the necessary and indeed the only resource
when a county has gotten in debt for necessary expenses. There is no
other way for the county to redeem its credit. This deficit was not for
schools but for the necessary expenses of the county, which was not
allowed to levy over 19 cents by reason of the State tax.

The Constitution, Art. V, sec. 6, prescribes: "The taxes levied by the
commissioners of the several counties for county purposes shall be levied
in like manner with the State taxes, and shall never exceed the double
of the State tax, except for a special purpose, and with the special
approval of the General Assembly." Adding this 2⅔ cents to the 19
cents already levied for county purposes makes a total of 21⅔ cents.
This levy, far from exceeding "double the State tax," the limit named
in this provision, is in fact considerably less than one-half the State tax,
which was 47⅔ cents on the $100. ·Laws 1913, ch. 201, sec. 3.

The tax here in question is authorized for a special purpose "to pro-
vide for any deficiency in the necessary expenses and revenue of said
respective counties," and received the special approval of the General
Assembly, sec. 9, ch. 33, Laws 1913. This levy, therefore, is exactly
within the authority of the General Assembly and the restrictions of the
Constitution of the State. Art. V, sec. 6, above set out.

It is alleged, and correctly, that the insufficient levy of 19 cents to
defray the county expenses was due to the fact that the State, in order
to make adequate provision for the six-months schools, raised the tax
levy for all State purposes to 47⅔ cents, and hence the margin between
that and the normal 66⅔ cents left only 19 cents for the counties. It

became necessary, as is found as a fact by the county commissioners and also by the judge, and is not controverted, to levy the extra 2⅔ cents per $100 in order to defray the county expenses for necessary purposes. This levy in excess of the 19 cents being for necessary purposes did not require a vote of the people.

The levy of this tax in 1915 is stated by the board, and is found as a fact by the court, to be for the special purpose of taking up a note in bank made by the board of commissioners for a deficiency in meeting the necessary expenses of the county for 1914, and was authorized by chapter 88, Laws 1913, which recites the fact that the increase of taxes for the purpose of increasing school facilities would probably "leave the counties without sufficient revenue with which to pay their current necessary expenses." It therefore has the special approval of the General Assembly. Why refund it to plaintiff when the county must again collect it?

It is true that the General Assembly of 1913 increased the general State taxes 5 cents for the purpose of increasing the terms of the public schools to six months, but if there is any unconstitutionality it attaches to the increase of the general State tax by this 5 cents, and there can be no unconstitutionality in allowing the counties to levy additional taxes for necessary county purposes when the deficiency is not caused by county action or lack of legislative special approval. The complaint, if any, of the plaintiff should not be directed against the levy of this special tax for necessary county purposes with the special approval of the General Assembly, but against the legality of the 5-cent additional State tax levied by the Legislature for State purposes. In the language of the market-place, the plaintiff "has the wrong sow by the ear."

The county must pay its necessary expenses or it cannot continue to discharge its legitimate functions. Its credit will be destroyed and the county government will become inefficient. Its commissioners have not levied to exceed double the State tax, and the 2⅔ cents was for a special purpose, for which the General Assembly has given its special approval. The deficiency was caused by the action of the General Assembly, which has not been called in question in this or any other proceeding.

North Carolina not only stands at the foot of the States in illiteracy and in the shortness of school terms, but its levy of taxation for schools, for good roads, and public health is the lowest of any State in the Union, being less than half the average for such purposes levied by the other States of the Union. To meet this situation and remove this reproach, and enhance the welfare of the people whom they represent, the General Assembly of 1913 increased the school term to six months. And knowing that the appropriation therefor would render the margin left for county purposes insufficient for their administration, the General As-

sembly gave its special approval for this additional taxation by the counties. If there is any unconstitutionality in the action of the General Assembly it is in the levy for the six-months schools by the General Assembly, which is not impeached by this proceeding.

The people of the State, by a vote of more than 100,000 majority, have endorsed the action of the General Assembly of 1913, which has been followed by the General Assemblies of 1915 and 1917, by adopting the constitutional amendment requiring six-months term for public schools. At this term we have had three cases calling in question special taxation to extend school facilities. In each of the three this Court has invalidated the effort to do so. In *Williams v. Polk County* the act of the General Assembly authorizing the special tax was, however, not set aside by the Court, but the result of the election was invalidated because of an illegality in the manner of holding the election, and the Court was unanimous. In *Hill v. Lenoir,* the act of 1911 authorized any county to vote a special tax for school purposes, as the General Assembly has a right to do under the Constitution, and prescribed that at such election, if the entire county gave a majority for such tax, it should be a county measure, but that if it did not carry for the entire county it should be valid for each township in which such measure received a majority. This manner of voting was a matter within the good judgment of the General Assembly, and there was no provision of the Constitution pointed out which forbade the Legislature to authorize such manner of voting, nor any provision of the Constitution authorizing this Court to invalidate the action of the General Assembly. Besides, the act was a general one passed in 1911, and under it elections have been held in many counties, in some of which the counties, and in some townships, had adopted the special tax. A dissent was entered by me as to that decision and in this case.

The Supreme Court of the United States has repeatedly said that it would not hold an act unconstitutional unless it was so "beyond all reasonable doubt." *Ogden v. Saunders,* 12 Wheaton, 270; *S. v. Perley,* 173 N. C., 791; Cooley Cons. Lim. (7 Ed.), 254. For that reason, besides for those given in this dissent, it would seem that these measures which the General Assembly has enacted to give the children of the State a better opportunity for an education should not be disapproved and invalidated by this Court.

On the face of the Federal and State Constitutions it was clearly contemplated that the legislative department should be the guardian of the Constitution fully as much as the judicial, and that legislation held by it constitutional should be conclusively so, as in all other countries, subject only to the veto of the executive (where this is given) and to the approval of the sovereign at the ballot box. There is certainly no indi-

cation given in any Constitution of superiority or supremacy of the judicial over the legislative department.

Those who believe in the supremacy of the courts over legislation and the law-making body stress the fact that the judges are sworn to obey the Constitution, and therefore they must judge whether the Legislature has complied with the Constitution or not. But the members of the Legislature and of Congress are equally sworn to obey the Constitution, and therefore they, and not the courts, are charged with the duty of deciding whether legislation is in accordance with the Constitution or not. For the same reason, the Legislature is not empowered to hold that decisions of the courts in matters committed to them are unconstitutional.

If there was any provision in the State Constitution which empowers the Court to go behind such finding of the Legislature, it would be in effect giving an appeal from the Legislature to the Court. On an appeal from the Superior Court to this Court, five judges review the trial judge to insure uniformity in the law, because the Constitution confers the power. There is no such provision in the State Constitution as to the Legislature and the jurisdiction of the Court to go behind the finding by the two Houses of the General Assembly that an act is in conformity to the Constitution is logically and necessarily based upon the assumption that the Legislature has either ignorantly or intentionally violated the Constitution, and that therefore, of necessity, the Court, by reason of its superiority of wisdom or virtue, must have power to invalidate the action of the law-making body. This assumption has not been warranted by experience, and has no foundation in fact.

On an average, two-thirds of each House of the General Assembly and of both Houses of Congress have usually been lawyers. They have the intelligence to read the Constitution and the patriotism and integrity to observe it. The numerous instances in which the courts have overruled their own previous decisions on so-called "constitutional questions" (and others in which they should, or may yet, do so) are a judicial holding that the courts themselves have acted unconstitutionally. Certainly when the far greater number of lawyers in the law-making body, entrusted by the Constitution to make the laws in the discharge of the duty committed to them, hold an act constitutional, and a minority of the Court agree in that view, it cannot be held that the Legislature, "beyond a reasonable doubt," either ignorantly or intentionally, have violated their oaths to support the Constitution.

In the Convention at Philadelphia in 1787, which created the Federal Constitution, James Madison (afterwards President) and James Wilson (afterwards Justice of the U. S. Supreme Court) offered an amendment that all bills should be submitted and approved by the courts before be-

ing enacted. Though presented and pressed with great force, the proposition was voted on four times, and on each occasion defeated, receiving at no time the vote of more than three States. The authority of the courts to invalidate an act of Congress or State Legislature is not expressed in the Federal or any State Constitutions, but is derived from the decision in *Marbury v. Madison* by the U. S. Supreme Court in 1803, deducing it as a legal inference. It was denied then by President Jefferson, the founder of one of the great parties, and later by Abraham Lincoln, the leader of another. In view of the increasing number of cases involving matters of public policy in which the views of the courts are such as to invalidate legislation it may be wise (if the courts are to continue to assert this supreme and irreviewable power over legislation) to submit legislation to the courts for approval, as suggested at Philadelphia, before it is enacted, instead of having it vitiated afterwards. It would be a great economy of time and expense.

In this State, a somewhat similar decision, derived, like *Marbury v. Madison,* by legal deduction or inference, in *Hoke v. Henderson,* 15 N. C., 1 (Dec., 1833), for seventy years was an obstruction to legislation and a constant source of conflict between the Legislature and the judiciary until after being affirmed sixty times, it was finally overruled as unfounded in *Mial v. Ellington,* 134 N. C., 131 (1·Dec., 1903). One Federal Supreme Court decision was corrected by the Eleventh Amendment and another by the Seventeenth Amendment, and in the *Adamson Law case* the Court overruled, and thereby held unconstitutional, its previous decision in the *Lochner case.* Courts make errors as well as Legislatures and Congress (as shown by overruling decisions and others which should be overruled), and their correction by constitutional amendment is too dilatory. for a progressive age and people and too costly a deference to a merely hypothetical and supposed infallibility in the courts.